**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

SAMUEL CABASSA,

                              Plaintiff,

          v.                                                    No. 11-CV-1237
                                                                    (MAD/CFH)

C. OSHIER, Clerk II, Clinton Correctional
Facility; D. ARTUS, Superintendent, Clinton
Correctional Facility; T. LaVALLEY,
Superintendent, Clinton Correctional Facility;
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; E. BLAISE,
Register Nurse, Clinton Correctional Facility;
S. MILLER, Nurse Practitioner, Clinton
Correctional Facility; M. MAXON,
Optometrist, Clinton Correctional Facility;
JENNETT, Correctional Officer, Clinton
Correctional Facility; EZRO, Correctional
Officer, Clinton Correctional Facility;
J. MILBURN, Correctional Officer, Clinton
Correctional Facility; M. PATNODE, Deputy
Superintendent for Programs, Clinton
Correctional Facility; B. LECUYER,
Nurse Administrator, Clinton Correctional
Facility; BADGER, Registered Nurse,
Clinton Correctional Facility; K.M. LEE,
Medical Doctor, Clinton Correctional Facility;
V. JOHNSON, Medical Doctor, Clinton
Correctional Facility; JOHN DOE A. through F.,
Correctional Sergeants, Clinton Correctional
Facility; JOHN DOE G. and H., DOCS
Utilization Review Committee, Albany,

                              Defendants.[1]

_____

**APPEARANCES:**                                    **OF COUNSEL:**

_____

          [1]Officers "Jennet" and "Ezro" are spelled "Jennette" and "Ezero" in their respective
Acknowledgments of Service as well as defendants' motion to dismiss.  Dkt. Nos. 12, 15,
34.  The Court proceeds with the latter spellings and will direct the Clerk's Office to make
the necessary changes on the docket to reflect the defendants' actual names.

SAMUEL CABASSA
Plaintiff Pro Se
Wende Correctional Facility
Wende Road, P.O. Box 1187
Alden, New York 14004-1187


HON. ERIC T. SCHNEIDERMAN            GREGORY J. RODRIGUEZ, ESQ.
Attorney General for the             Assistant Attorney General
  State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff pro se Samuel Cabassa ("Cabassa"), an inmate currently in the custody of the

New York State Department of Corrections and Community Supervision ("DOCCS"),[3] brings

this action pursuant to 42 U.S.C. § 1983 alleging that defendants, DOCCS, fourteen

DOCCS employees, and eight John Does, violated his constitutional rights under the First

and Eighth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 et seq. and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  Compl. (Dkt.

No. 1) at 52–56.  Presently pending is defendants' motion to dismiss certain defendants

and claims pursuant to Fed. R. Civ. P. 12(b)(6).[4]  Dkt. No. 34.  Cabassa opposes this

--------------------

[2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3]The New York State Department of Correctional Services merged with the Division
of Parole and is now the New York State Department of Corrections and Community
Supervision.

[4]The present motion was filed on behalf of all defendants except all John Does.
Dkt. No. 34 at 1.  Even though defendants in their notice of motion seek dismissal of the

2

instant motion.  Dkt. No. 46.  For the following reasons, it is recommended that defendants'

motion be granted in part and denied in part, and that Cabassa be provided an opportunity

to file an amended complaint.


# I.  Background

The facts are related herein in the light most favorable to Cabassa as the non-moving

party.  See subsection II(A) infra.  Cabassa's allegations took place over a period of

approximately two years and two months.


### 1.  October 9, 2008 - October 31, 2008

On October 9, 2008, one day after Cabassa was transferred to the Clinton Correctional

Facility ("Clinton"), Cabassa met with defendant Blaise, a nurse, and defendant Oshier, a

clerk.  See Compl. ¶ 6(3).  Cabassa explained to Blaise and Oshier that because he is blind

in his left eye and visually impaired in the right, he required a contact lens and

non-prescription glasses with a sixty-percent grey gradient tint to control his photophobia.[5]

Id. ¶ 6(2).  These visual aids were to generally protect Cabassa's good eye from external

matters and prevent intolerable pain and migraine headaches resulting from exposure to

bright lights.  Id. ¶ 6(6).  Cabassa required a medical permit to wear tinted glasses at

---

entire complaint, they do not oppose Cabassa's Eighth Amendment use of force claims
nor his First Amendment retaliation claims in their memorandum of law.  Dkt. No. 34-1 at
1.  Accordingly, this Court considers the instant motion as a motion to partially dismiss the
remaining causes of action in Cabassa's complaint.

[5]Cabassa defines "photophobia" as "sensitivity to bright natural or artificial lighting."
Compl. ¶ 6(2).

Clinton.  Id. ¶¶ 6(3), (5).  Despite Cabassa's explanations, Blaise and Oshier accused him of lying about his visual impairments and denied Cabassa permits for both the use of his personal glasses and the issuance of a new pair of glasses.  Id. ¶¶ 6(4), (7).

On October 10, 2008, Cabassa sent a letter to defendant Artus, superintendent, complaining about the actions of Blaise and Oshier, as well as defendant Ezero, a correctional officer who threatened Cabassa after Cabassa informed Oshier of his intent to file a grievance against her.  Compl. ¶¶ 6(10)–(12).[6]  Artus referred the letter to defendant LaValley, also a superintendent.  Id. ¶ 6(12).

On October 12, 2008, Cabassa informed Clinton's nursing staff that he could not pick up his nighttime pain medication because the walk would expose him to bright lights, which would cause him eye pain and migraine headaches.  Compl. ¶ 6(13).  An unnamed nurse gave Cabassa a refusal form, where Cabassa noted his reasons for declining to pick up his medication and requested to have his nighttime medication delivered to his cell.  Id. ¶¶ 6(14)–(15).  Instead of granting his request for an accommodation, defendant Miller, a nurse, discontinued Cabassa's nighttime medication.  Id. ¶ 6(16).

On October 20, 2008, Cabassa sent a letter to defendant Johnson, a medical doctor,

_____

[6]Cabassa alleged that Ezero intended to assault him at that time but he avoided it by locking himself in his cell.  Compl. ¶ 6(11).  Liberally construing this allegation, Cabassa was attempting to allege an Eighth Amendment violation.  However, threats and harassment alone, without allegations of accompanied injury or use of force, are insufficient to state an Eighth Amendment claim.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983.").  Thus, Cabassa has failed to allege an Eighth Amendment claim based on Ezero's threats and harassment.

4

complaining that Oshier and Blaise denied him his medically necessary glasses, exposed his monocular vision to risk of danger and pain, and incited fear in him. Compl. ¶ 6(17). Cabassa made several requests to Johnson: (1) to grant him a temporary permit for wearing glasses; (2) to deliver his nighttime medication to his cell; and (3) to provide reasonable accommodations with regard to the showering facilities because the use of stairs to reach the showers caused him extreme pain in the hips, knees, and back. Id. ¶¶ 6(17)–(18).

On October 21, 2008, Cabassa told Miller that Blaise and Oshier denied him medically necessary glasses and supported his medical claims regarding the provision of such glasses with medical records and permits from various prisons.[7] Compl. ¶ 6(19). Upon learning this information, Miller instructed Oshier to issue Cabassa a pair of solar shield sunglasses and Oshier returned with "a huge pair of 100% black sunglasses" that resembled "welding glasses."[8] Id. ¶¶ 6(22)–(23). Miller advised an officer of Cabassa's feed-in-cell status and the nighttime nursing staff to deliver pain medication to Cabassa's cell. Id. ¶¶ 6(23)–(24). Cabassa also complained to Miller about the layout of the showers because the walk to the showers required traveling along staircases that caused him

---

[7]The medical records generally substantiate Cabassa's assertions that he is blind in the left eye, has photophobia, and was first prescribed tinted glasses in 1985 to alleviate migraine headaches. See Ex. I Cabassa Medical Eye Clinic Record, 1984–2012 (attached to Cabassa Decl.) (Dkt. No. 47-2) at 2.

[8]Cabassa alleged that the solar shield glasses were extremely dark to the extent that he could not see with them; thus, as a result, he bumped into gates, walls, radiators, and other inmates, as well as fell down the stairs. Compl. ¶ 6(49). Cabassa attached three declarations from other inmates, all pointing to incidents of seeing Cabassa either falling down or being hit by objects or inmates because Cabassa could not avoid them due to his poor vision. See Butler Decl. (Dkt. No. 47-6) at 68; Smith Decl. (Dkt. No. 47-6) at 72; Irizarry Decl. (Dkt. No. 47-6) at 73.

extreme pain in his knees and hips, and the lack of hand-rails, along with the twenty-two fluorescent lights and slippery shower surfaces, presented a safety risk to his physical mobility. Id. ¶¶ 6(25)–(26). Cabassa emphasized that because there were forty shower-heads in a straight row, each about two-feet apart, his blind eye made him susceptible to bumping into other inmates, which instigated at least one involuntary fight.[9] Id. ¶ 6(27). Miller agreed that Cabassa's concerns were sufficient to grant him a medical shower designation. Id. ¶ 6(28).

On October 31, 2008, Cabassa sent Miller a letter requesting an exemption from performing any kind of heavy lifting because, since he walks with a cane, simultaneously performing heavy lifting caused him excruciating pain and damage to his left shoulder, lower back, hips, and knees. Compl. ¶ 6(29). Cabassa never received a reply. Id.

### 2.  November 19, 2008 - December 2, 2008

On November 19, 2008, Cabassa was transferred to C-block, where he gave defendant Jennette, a correctional officer, his feed-in-cell permit. Compl. ¶ 6(41). Despite Cabassa's explanations regarding his visual impairments, Jennette refused to honor the permit. Id. ¶¶ 6(41)–(42). When Cabassa skipped breakfast the next morning, Jennette sent Cabassa to the hospital to see Blaise, claiming that Blaise could not issue such a feed-in-cell permit. Id. ¶ 6(43). After Cabassa explained to Blaise what had occurred, Blaise received approval

---

[9]Cabassa alleged that his poor eyesight heightens the risk that he will bump into other inmates in the shower, causing them to react violently. Compl. ¶ 6(27). More specifically, Cabassa attached a declaration to his response to the motion to dismiss, where inmate Irizarry stated that he saw a younger inmate being angry with Cabassa because Cabassa bumped into the younger inmate's rear while the younger inmate was picking up soap from the floor. Irizarry Decl. at 75.

from Miller to re-issue another thirty-day permit.  Id. ¶ 6(44).  When Jennette received the permit, he told Cabassa that Cabassa would have to "put down for sick call" and tell Blaise to stop issuing these permits.  Id. ¶ 6(45).  Cabassa sent Miller a letter on November 24, 2008, explaining that Jennette was starving him by not honoring the feed-in-cell permit, reiterating that he could not walk to retrieve his meals without experiencing excruciating pain in his left shoulder, right knee, and hips, seeking Miller's intervention, and requesting that his nighttime medication be delivered to his cell.  Id. ¶ 6(46).

On November 25, 2008, Cabassa approached LaValley about a complaint and grievance against defendant Maxon, an optometrist.  Compl. ¶ 6(47).  LaValley responded that Maxon was only "looking out for" Cabassa, then ordered Cabassa to take off his tinted glasses despite Cabassa showing LaValley his medical records and demonstrating how the solar shield sunglasses were darker than his personal tinted glasses.  Id. ¶¶ 6(47)–(49).  LaValley declined Cabassa's request for permission to temporarily wear his tinted glasses and confirmed that Jennette had rescinded Cabassa's feed-in-cell status.  Id. ¶¶ 6(49)–(50).

On November 26, 2008, defendant Badger, a nurse, delivered daytime medication to Cabassa and informed Cabassa that his nighttime medication was terminated.  Compl. ¶ 6(51).  Later that afternoon, Cabassa received a letter from the nursing staff instructing him to go to mess-hall for meals because no medical restrictions precluded him from doing otherwise, effectively terminating his feed-in-cell status.  Id. ¶ 6(53).

On December 1, 2008, Cabassa sent a letter to the DOCCS Commissioner, complaining that Maxon, Blaise, Oshier, Jennette, Artus, and LaValley were deliberately subjecting him to an involuntary hunger-strike because his feed-in-cell permit was revoked, and despite the nursing staff's contentions, he was physically unable to ambulate to the

7

mess-hall.  Compl. ¶¶ 6(53)–(54).  On December 2, 2008, Cabassa filed a grievance alleging that:  (1) Artus and LaValley oversaw and condoned discriminatory acts against his visual impairment; (2) Jennette refused to honor his feed-in-cell permit and compelled medical staff to rescind the permit; and (3) he was subjected to an involuntary hunger-strike.  Id. ¶ 6(66).  On the same day, Cabassa sent Artus a copy of the December 2 grievance and December 1 complaint against Maxon and Oshier, claiming retaliation for filing grievances.  Id. ¶ 6(40).

### 3.  December 12, 2008

Cabassa alleged that on December 12, 2008, defendant Milburn, a correctional officer, and John Does A through F, physically assaulted him in front of D-block.  Compl. ¶¶ 6(68)–(74), at 11, 55.  Cabassa alleged that he could barely move after the assault and cried "over the brutalization and humiliation."  Id. ¶ 6(79).

### 4.  December 31, 2008

On December 31, 2008, Maxon, an optometrist, informed Cabassa that he was instructed to deny Cabassa the use of his personal sunglasses and refrain from prescribing him permanent tinted lenses; however, Maxon was authorized to prescribe transitional lenses.  Compl. ¶ 6(81).  Despite Cabassa's explanations that transitional glasses caused him migraine headaches and eye pain, Maxon replied that he had to follow instructions.  Id. ¶ 6(82).

### 5. March 3, 2009 - July 31, 2009

On March 3, 2009, Cabassa saw Miller and told her that he was experiencing pain in his left shoulder, hips, and back caused by the assault on December 12, 2008. Compl. ¶ 6(83). Cabassa begged for nighttime medication and promised to walk to the infirmary to pick it up himself. Id. Miller told Cabassa that he should receive state-issued glasses within two weeks. Id. ¶ 6(84).

On April 30, 2009, Cabassa went to pick up his nighttime medication and told Badger that the bright lights in the mess-hall were causing him great pain, then again requested that his nighttime medication be delivered to his cell. Compl. ¶ 6(86). However, on May 1, 2009, Miller entered into Cabassa's Ambulatory Health Records ("AHR") that Cabassa refused nighttime Tylenol #3 and discontinued Cabassa's daytime and nighttime Tylenol #3. Id. ¶ 6(87).

Cabassa requested for his nighttime medication to be discontinued only if reasonable accommodation in having it delivered to his cell was denied. Compl. ¶ 6(90). However both his daytime and nighttime medications were discontinued. Id. On July 31, 2009, Cabassa asked Miller the reason for discontinuing both his medications, to which Miller replied that Badger refused to have the nurses perform the deliveries. Id.


### 6. August 28, 2009 - April 12, 2010

On August 28, 2009, Macelaru, an orthopedist, recommended cortisone injections to treat Cabassa's knee pain. Compl. ¶ 6(91). Miller reviewed this recommendation on September 17, 2009 and disregarded it. Id. ¶ 6(92). On September 14, 2009, Cabassa

saw Gigante, a retinal specialist, who informed him that he had a cataract growth on his right eye, which served as the underlying reason for his double vision, excessive glare resulting in migraines, and eye pain.  Id. ¶ 6(92).  Gigante did not recommend surgery at this time because of the high risk involved; however, Gigante recommended that Cabassa use tinted lenses to reduce the glare.  Id. ¶ 6(93).

A few months later, on December 14, 2009, Gigante informed Cabassa that his cataract had enlarged and opined that surgery may be necessary despite its high risk.  Compl. ¶ 6(95).  Gigante recommended that Cabassa should be housed with visually impaired inmates and given a new contact lens and a pair of safety glasses with gradient tints.  Id. On January 11, 2010, Cabassa asked Maxon about Gigante's recommendations.  Id. ¶ 6(101).  Maxon agreed that Cabassa belonged in a sensorially disabled facility but refused to carry out the recommendations.  Id. ¶¶ 6(102)–(103).  On April 12, 2010, Gigante opined that Cabassa required surgery because Cabassa's cataract and visual impairments were in rapid decline.  Id. ¶ 6(96).

### 7.  May 12, 2010 - July 15, 2010

On May 12, 2010, Rodriguez, Cabassa's counselor at Clinton, told Cabassa to complete and submit a Request for Reasonable Accommodations form to defendant Patnode, deputy superintendent for programs, in order to be transferred to a sensorially disabled facility.  Compl. ¶ 6(97).  Cabassa filed the form and included a list of requests for other accommodations such as magnifiers, sunglasses, new contact lens, plain non-medical sunglasses with a forty-five percent gradient tint, and feed-in-cell and medical shower permits.  Id. ¶¶ 6(98)–(99).

10

On June 4, 2010, Eden, a cornea specialist, recommended that Cabassa be given permanent gradient tinted eyeglasses and a new contact lens while awaiting surgery. Compl. ¶ 6(100).  On or about July 15, 2010, Johnson granted Cabassa's requests for feed-in-cell and medical showers permits.  Id. ¶ 6(104).

### 8.  August 27, 2010 - December 29, 2010

On August 27, 2010, Cabassa sent a letter to Johnson, complaining that defendant Lee, a medical doctor, refused to provide him with pain medication.  Compl. ¶ 6(105).  On September 10, 2010, Macelaru, provided Cabassa with cortisone injections and recommended he take certain medications.  Id. ¶ 6(106).

On October 28, 2010, Cabassa sent letters to LeClaire, deputy commissioner of correctional facility operations, and Carver-Jordan, director of classification and movement, requesting that they expedite his transfer to a sensorially disabled facility.  Compl. ¶ 6(107). Even though on October 29, 2010, Cabassa received a decision denying him the transfer (id. ¶ 6(108)), Cabassa was transferred to Wende Correctional Facility's Sensorially Disabled Program on December 3, 2010, where he also received a pair of tinted glasses around March 27, 2011.  Id. ¶ 6(111).

On December 20th and 29th, 2010, Cabassa sent a letter to Johnson complaining that Lee refused to follow Macelaru's recommendations to provide Cabassa with pain medication.  Compl. ¶ 6(109).

## 9. October 17, 2011 - August 20, 2012

Cabassa commenced this action on October 17, 2011, seeking compensatory and punitive damages. Compl. at 1, 57. Defendants filed a motion to dismiss on May 30, 2012. Dkt. No. 34. On August 20, 2012, Cabassa responded with a memorandum of law with an attached appendix.[10] Dkt. Nos. 46, 47.

## II. Discussion

Cabassa asserts a number of claims, specifically that: (1) defendants Oshier, Artus, LaValley, Blaise, Miller, Maxon, Lecuyer, and Johnson violated his Eighth Amendment rights by denying him use of his personal glasses, denying him a contact lens and state-issued tinted glasses, and issuing him dark solar shield sunglasses; (2) defendants Oshier, Miller, Maxon, Lecuyer, Johnson violated his First Amendment rights by denying him a contact lens and state-issued tinted glasses, which represented the proximate cause to denying him access to the courts; (3) defendants Oshier, LaValley, Miller, Jennette, and Badger violated his Eighth Amendment rights by interfering with his feed-in-cell status resulting in forced involuntary starvation; (4) defendants Oshier, LaValley, Miller, Maxon, Jennette, Ezero, Milburn, Badger, and Johnson violated his Eighth Amendment rights by interfering with his medication being delivered to his cell; (5) defendants Miller and Johnson violated his rights under the Eighth Amendment, ADA and Rehabilitation Act by depriving

---

[10]The attached appendix includes documents such as: medical records; DOCCS's various Directives; letters to certain defendants and responses from them concerning requests for reasonable accommodations; grievances and complaints; declarations of inmate witnesses; and complaints and decisions from Cabassa's prior lawsuits. Dkt. No. 47.

him accommodating showers; (6) defendant Lee violated his Eighth Amendment rights by denying him pain medication; (7) defendant DOCCS violated his rights under the Eighth Amendment, ADA, and Rehabilitation Act by denying him transfer to a sensorially disabled facility; (8) defendants Oshier, Miller, Maxon, Johnson, Lecuyer, Ezero, Jennette, and LaValley violated his First Amendment rights by retaliating against him for filing grievances; (9) defendants Milburn and John Doe A through F violated his Eighth Amendment rights for using excessive force; and (10) defendants LaValley and Artus violated his First and Eighth Amendment rights by admitting him to the mental health observation unit, resulting in retaliation in the form of an assault.

Defendants contend that: (1) the applicable statute of limitations bars Cabassa's § 1983 claims; (2) the Eleventh Amendment bars Cabassa's § 1983 claims against DOCCS as well as individual defendants in their official capacities; (3) Cabassa failed to allege the personal involvement of Artus, LaValley, Ezero, Patnode, Lecuyer, and Miller as to the §1983 claims; (4) Cabassa failed to state a medical deliberate indifference claim against Johnson, Lee, Blaise, Oshier, Jennette, Badger; (5) Cabassa failed to state a First Amendment access to court claim; and (6) the Eleventh Amendment and relevant case law bar Cabassa's ADA and Rehabilitation Act claims against all individual defendants. Defs.' Mem. of Law (Dkt. No. 34-1) at 2.

## A. Legal Standard

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a

motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 680.

Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citations omitted). However, there are instances where the court may consider documents outside those previously referenced, including when the documents are only "partially quoted in [the] complaint . . .; integral to [the] complaint . . .; [or] relied upon . . . in drafting the complaint . . . ." Faulkner v. Beer, 463

14

F.3d 130, 134 (2d Cir. 2006) (internal quotation marks and citations omitted).  Specifically,

the following documents may be considered when construing a complaint's pleading

sufficiency:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, . . . and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

Weiss v. Incorp. Village of Sag Harbor, 762 F. Supp. 560, 567 (E.D.N.Y. 2011) (citations

omitted).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v.

Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous

to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a

court is obliged to construe his pleadings liberally.'" (citations omitted)).

## B.  § 1983 Claims

### 1.  Statute of Limitations

As an initial matter, defendants move to dismiss Cabassa's claims arising under § 1983 on the ground that the relevant statute of limitations bars those claims.  While there is no statute of limitations provision in § 1983, § 1988 provides that state law may apply if it is not inconsistent with the Constitution or federal law.  42 U.S.C. § 1988(a) (2003); Moor v. Cnty. of Alameda, 411 U.S. 693, 702–03 (1973).  In New York, the applicable statute of limitations for a § 1983 suit is three years, derived from the general or residual personal injury laws of the forum state.  See N.Y. C.P.L.R. § 214(5) (McKinney 2012); Owens v. Okure, 488 U.S. 235, 249–50 (1989); Romer v. Leary, 425 F.2d 186, 187 (2d Cir. 1970); Lugo v. Senkowski, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000) (applying Owens in establishing a three-year statute of limitation for § 1983 claims).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim.  Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002).  The claim accrues "when the plaintiff knows or has reason to know" of the harm.  Id. (citations and internal quotation marks omitted).  "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action."  Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980).  Additionally, "a pro se prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials."  Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (citing Houston v. Lack, 487 U.S. 266, 270 (1988); Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)).

16

Cabassa correctly argues that this action is not barred by the statute of limitations. Dkt. No. 1-1 at 1; Pl.'s Mem. of Law (Dkt. No. 46-2) at 5–6. Here, the complaint is deemed filed on October 11, 2011, the date that Cabassa stated he delivered the complaint to a prison official. Dkt. No. 1-1 at 1. This action accrued on October 9, 2008, the oldest date from which Cabassa knew or had reason to know of the harm he allegedly suffered from the denial of visual aids. Compl. ¶¶ 6, 6(4)–(7). Thus, the statute of limitations for this action should have expired on October 9, 2011, three years after the oldest alleged incidents occurred. However, because October 9, 2011 was a Sunday and October 10, 2011 was Columbus Day, a holiday, the statute of limitations for this action expired on October 11, 2011. Day v. Morgenthau, 909 F.2d 75, 78 (2d Cir. 1990) (noting federal law is used to compute the time period allowed by any applicable statute); Fed. R. Civ. P. 6(a)(1)(c) (explaining that a time period cannot end on a Saturday, Sunday, or legal holiday). Cabassa filed this action on the date of expiration. Therefore, Cabassa timely filed this § 1983 action.

Accordingly, defendants' motion on this ground is denied.


## 2. Eleventh Amendment

Cabassa sues the defendants in both their individual and official capacities. Compl. at 8. Defendants seek dismissal of Cabassa's claims against them in their official capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh

Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Id. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Cabassa seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS. Thus, the Eleventh Amendment bar applies and serves to prohibit Cabassa's claim for monetary damages against defendants in their official capacities. Likewise, Cabassa's § 1983 claim against DOCCS should also be dismissed as "[t]he law is clear that the state, and state agencies such as DOCS, are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity . . . ." Jackson v. Johnson, 985 F. Supp. 422, 426 (S.D.N.Y. 1997).

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 3. Personal Involvement

Defendants contend that Cabassa failed to establish the personal involvement of Artus, LaValley, Ezero, Patnode, Lecuyer, and Miller. "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[11]

---

[11] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass

### a. Artus

Cabassa contends that he placed Artus on notice of prior violations through several letters, one of which Artus referred to LaValley for appropriate review and action.  Compl. ¶¶ 6(12), (40).  However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement.  Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . .").  Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  Further, personal involvement is not established when the alleged involvement is the defendant merely referring the inmate's complaint to the appropriate staff investigator.  See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)).

Cabassa also contends that he had verbal conversations with Artus in various housing blocks during the events and time periods indicated in the complaint.  Compl.

Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

¶ 6(120). Specifically, "around late February or in March 2009," Cabassa complained to

Artus with respect to his medical concerns and the prior assault. Cabassa Decl. (Dkt. No.

46) ¶ 82.

> It has been held that "an appropriate guiding principle" for
> determining personal responsibility is where a grievance alleges
> an "ongoing" constitutional violation, the supervisory official who
> reviews the grievance is "personally involved" if he is confronted
> with a situation that he can remedy directly. If the official is
> confronted with a violation that has already occurred and is not
> ongoing, then the official will not be found personally responsible
> for failing to "remedy" a violation.

Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (internal citations omitted).

Because Cabassa alleged that Maxon was deliberately indifferent to his medical needs until

at least as late as January 2010, Artus had notice of an ongoing constitutional violation that

he could have been prevented or remedied. Therefore, Cabassa has established Artus's

personal involvement through these conversations.

Accordingly, defendants' motion on this ground should be denied.

### b. LaValley

Cabassa contends that LaValley was deliberately indifferent to his medical needs.

Cabassa asserts that he had a verbal conversation with LaValley on November 25, 2008

about the grievance against Maxon dated November 7, 2008. Compl. ¶ 6(47); Grievance

dated 11/25/08 (attached to Cabassa Decl.) (Dkt. No. 47-5) at 76. Specifically, LaValley

defended Maxon, ordered Cabassa to remove his glasses, and declined Cabassa's request

for permission to wear his personal glasses on a temporary basis. Compl. ¶¶ 6(47)–(49).

Moreover, LaValley affirmed that Jennette had rescinded Cabassa's feed-in-cell status. Id.

¶ 6(50). Therefore, defendants are incorrect to argue that Cabassa's allegations are merely conclusory as LaValley was directly involved in multiple alleged Eighth Amendment violations. LaValley clearly participated in investigations into the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be denied.

### c. Ezero

In his complaint, Cabassa contends that Ezero deprived him of his personal glasses and threatened him with physical injury for wearing his personal glasses. Compl. ¶¶ 6(10)–6(11), 55. Because these claims allege Ezero's direct participation in an alleged constitutional violation, defendants' motion on this ground should be denied.

### d. Patnode

Cabassa contends that in April 2010, he submitted a form to Patnode requesting reasonable accommodations for his visual impairments, specifically, a transfer to a sensorially disabled facility. Compl. ¶¶ 6(97)–6(98). Cabassa further contends that the contents of the form contained ongoing requests for accommodations that remained unfulfilled. Pl's Mem. of Law in Opp. at 10–11. However, merely writing letters to a defendant is insufficient to establish notice and personal involvement. Smart, 441 F. Supp. 2d at 643. Patnode did not fail to act on information that Cabassa's rights were being infringed upon; the allegations show that Patnode's involvement was strictly ministerial—that he was simply provided with a form and, without reviewing it, presumably

22

referred it to a higher ranked officer. Further, Cabassa does not allege that Patnode personally investigated or acted on the letters. <u>Rivera</u>, 655 F. Supp. 2d at 238. There is no evidence that Patnode was a supervisor; thus, he was incapable of being grossly negligent in his supervision or training of subordinates. No evidence supports that Patnode created a policy or custom under which unconstitutional practices occurred.

Accordingly, defendants' motion on this ground should be granted.


### e. Lecuyer

Cabassa contends that he filed a grievance against defendant Lecuyer, a nurse administrator, claiming medical deliberate indifference for failing to provide tinted glasses, treatment for his left shoulder for over one year, and failure to provide pain medication generally and cortisone injection for the right knee specifically. Compl. ¶ 6(94). Cabassa alleged that he had verbal conversations with Lecuyer in the hospital concerning his medical problems and needs during the time periods as indicated in his complaint. <u>Id.</u> ¶ 6(120). Because Cabassa alleged that he notified Lecuyer of his requests for reasonable accommodations throughout the entire period of the alleged violations, liberally construing the complaint, Cabassa has proffered plausible facts to establish that Lecuyer had knowledge, investigated, or otherwise participated in decision making, policy making or training regarding the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be denied.

**f.  Miller**

Cabassa contends that Miller exercised deliberate indifference in refusing him medication and medical recommendations.  Compl. ¶¶ 6(90)–(92).  These claims involve Miller's direct involvement.  Accordingly, defendants' motion on this ground should be denied.

**4.  Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 829 (1970); <u>Matthews v. Armitage</u>, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  <u>Farmer</u>, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  <u>Id.</u>

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  <u>Smith v. Carpenter</u>, 316 F.3d 178, 184 (2d Cir. 2003) (quoting <u>Hudson</u>, 503 U.S. at 9).  Since there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2)

whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d 698, 702 (2d Cir. 1998).  "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  Farmer, 511 U.S. at 837.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, it follows that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).


### a.  Blaise and Oshier

Cabassa contends that defendants Blaise and Oshier were deliberately indifferent in failing to provide him with appropriate medical care for his eyes.

Cabassa has established a plausible claim as to a serious medical condition with regards to his visual impairments.  First, Cabassa has sufficiently alleged facts showing that

reasonable doctors have perceived his visual needs as worthy of comment or treatment. For example, Cabassa alleged that Gigante recommended surgery for his cataract and tinted lenses to reduce glare as well as transfer to a sensorial disabled facility. Compl. ¶¶ 6(93), (95), (96). Further, Eden recommended that Cabassa receive tinted eyeglasses and a new contact while waiting for surgery to take place. Id. ¶ 6(100). Significantly, Cabassa was transferred to Wende Correctional Facility's sensorially disabled program on December 3, 2010 because of his medical needs. Id. ¶ 6(111). Second, viewing the facts in the light most favorable to the plaintiff, Cabassa has alleged that his severely poor eyesight significantly affects his abilities to read and write, so much so that it contributed to his failure to file certain court documents. Pl's Mem. of Law in Opp. at 5. Cabassa also alleged that exposure to bright lights caused him excruciating eye pain and migraine headaches and affected his ability to walk to the mess-hall for meals or retrieve his medication. Id. ¶¶ 6(6), (13), (24), (25); Koehl v. Dalsheim, 85 F.3d 86, 87–88 (2d Cir. 1996) (finding that the need for prescription eyeglasses constituted a serious medical condition when not having eyeglasses resulted in headaches and deteriorated vision that impaired daily activities); Rivera v. Goord, 119 F. Supp. 2d 327, 337 (S.D.N.Y. 2000) (finding that headaches and severe pain associated with diagnosed temporomandibular joint disorder (TMD), a jaw disorder, was sufficient to constitute a serious medical condition). Finally, Cabassa continuously alleged throughout this complaint that he experiences substantial pain and migraine headaches from exposure to bright lights. See generally Compl. Therefore, Cabassa has sufficiently alleged a serious medical need in his claim against Blaise and Oshier.

Cabassa has alleged sufficient facts demonstrating deliberate indifference on the part of Blaise and Oshier.  Cabassa stated that the contact lens and tinted glasses were essential to control his high myopia and photophobia.  Cabassa Decl. ¶ 36.  He complained to Blaise, after complying with Oshier's order to remove his glasses, that without his glasses, he would be exposed to a high risk of irreparable harm and intolerable pain and migraine.  Compl. ¶¶ 6(5)–(6).  Because Blaise and Oshier were directly informed of Cabassa's medical conditions, yet refused to allow him to wear his glasses or issue a permit for wearing his glasses, such actions present plausible facts sufficient to establish that Blaise and Oshier were deliberately indifferent to Cabassa's medical conditions.  The fact that Oshier later provided Cabassa with glasses does not diminish these findings because (1) the provision was pursuant to the direction of Miller, and without which, it is presumable that the deprivation would have continued, and (2) Oshier's action still represented a deliberate interference with treatment as assuming she was unable to provide the permit, she failed to direct Cabassa to Miller for obtaining the necessary permit.

Accordingly, defendants' motion on this ground should be denied.

### b.  Oshier

Cabassa also alleged that Oshier violated his Eighth Amendment rights by interfering with his feed-in-cell status and the delivery of pain medication to his cell.

Viewing the facts in the light most favorable to the plaintiff, if properly pled, Cabassa may state a plausible Eighth Amendment claim against Oshier based on the denial of the provision of medical permits and indifference to Cabassa's pain management treatment.

First, Cabassa has alleged that a reasonable doctor or patient would perceive his medical needs as worthy of treatment. Macelaru recommended cortisone injections to treat Cabassa's knee pain, (Compl. ¶ 6(191)), and Cabassa alleged throughout the complaint that it was DOCCS's practice to administer nighttime pain medication to him.[12] Second, Cabassa has alleged that he uses a cane and has difficulty using stairs because the associated motions caused him extreme pain in the hips, knees, and lower back. Compl. ¶¶ 6(17)–(18), (29). Hathaway v. Couglin, 37 F.3d 63, 67 (2d Cir. 1994) (reasoning that an inmate's experience with difficulty in ambulating and associated pain that resulted from a degenerative hip condition established that the inmate had serious medical needs). Third, Cabassa alleged throughout his complaint that he experiences pain in his knees, hips, lower back, and shoulder. Additionally, Cabassa's assertion that he has chronic pain and joint issues that interfere with his ability to ambulate is generally well-documented. See Ex. II–V (Dkt. No. 47-3) at 1–91 (including medical records and permits issued by DOCCS). However, Cabassa should amend his complaint to make specific allegations of serious medical conditions regarding pain and joint issues in connection to Oshier's alleged misconduct, in particular, her deliberate indifference in denying him the medical permits and subjecting him to an involuntary hunger-strike. Compl. ¶¶ 6(53)–(54).

Accordingly, it is recommended that Cabassa file an amended complaint that contains all relevant facts regarding these Eighth Amendment claims against Oshier.

---

[12]In addition to the legal sufficiency of the complaint on this matter, Cabassa's medical records, which he relied upon in drafting his complaint, generally substantiate Cabassa's claims with regard to his arthritis pains. See Ex. II–V (Dkt. No. 47-3) at 1–91.

### c. Johnson

Cabassa contends that Johnson acted with deliberate indifference in denying him pain medication, glasses, and contact lenses. Defendants contend that Cabassa has not alleged a serious medical condition. First, as previously discussed, both Cabassa's arthritic pain and visual impairments constitute serious medical conditions.

Second, viewing the facts in the light most favorable to the plaintiff, if properly pled, Cabassa may state a plausible Eighth Amendment claim against Johnson based on Johnson's deliberate indifference to his medical needs. Cabassa alleged that he sent four letters to Johnson discussing his medical needs and complaining how other DOCCS employees denied him medical treatment. Compl. ¶¶ 6(17)–(18), (105), (109). As an example, on October 29, 2008, Cabassa sent a letter to Johnson requesting feed-in-cell and medical shower permits. Id. ¶ 6(17)–(18); Cabassa Letter to Johnson dated 10/20/08 (Dkt. No. 47-5) at 18. On or about July 15, 2010, Johnson granted Cabassa these permits. Id. ¶ 6(104); Johnson Resp. dated 7/15/10 (Dkt. No. 47-5) at 22. This demonstrates a plausible claim that Johnson was not only personally involved in the decision-making process for issuing Cabassa these permits, but that Johnson was deliberately indifferent to Cabassa's medical needs by delaying the granting of permits for a substantial period of time. Further, Cabassa also alleged that the other letters sent to Johnson were complaints concerning defendant Lee, who allegedly refused to provide any sort of pain medication to manage Cabassa's physical pain. Compl. ¶¶ (104), (109); Cabassa Letter to Johnson dated August 27, 2010 (Dkt. No. 47-5) at 32. These letters concerning Lee were left unanswered. Thus, Cabassa should be granted an opportunity to amend his complaint to

make specific allegations of the filed grievances, Johnson's personal involvement, and the deprivation of medical permits.

Accordingly, it is recommended that Cabassa file an amended complaint that contains all relevant facts regarding these Eighth Amendment claims against Johnson.

### d. Lee

Cabassa contends that Lee acted with deliberate indifference in denying him pain medication. As previously discussed, Cabassa has alleged a serious medical need relating to his arthritis. Cabassa alleged that Lee completely denied him pain medication, even though it was recommended by Macelaru. Thus, Cabassa has sufficiently alleged that Lee had notice of his serious medical condition and acted with deliberate indifference to those medical needs by failing to provide him with any form of pain relief. Accordingly, defendants' motion on this ground should be denied.

### e. Jennette

Cabassa contends that Jennette was deliberately indifferent to his medical needs by denying him his feed-in-cell status and the delivery of pain medication to his cell. As discussed, Cabassa's arthritis pains constitute a sufficiently serious medical condition. Cabassa alleged that he explained to Jennette the reason for the feed-in-cell status is due to his visual impairments, which also constitute serious medical needs. Compl. ¶¶ 6(41)–(42). Thus, Cabassa has established a serious medical need for purposes of these claims.

Defendants argue that Cabassa's claim that Jennette subjected him to an involuntary hunger strike is meritless as Cabassa does not claim that he was prevented from going to the mess-hall for food or that anyone deprived him of food. Defs.' Mot. to Dismiss at 16. Even though this is a sound argument, it does not do away the allegations that Jennette knew of and disregarded Cabassa's serious medical needs, particularly when he was presented with a feed-in-cell permit issued by Blaise. Compl. ¶ 6(41). Thus, it can be fairly concluded that Jennette intentionally interfered with this already prescribed treatment in the way of an accommodation. Estelle, 429 U.S. at 104.

Accordingly, defendants' motion on this ground should be denied.


### f. Badger

Cabassa contends that Nurse Badger acted with deliberate indifference by interfering with his feed-in-cell status and the delivery of medication to his cell.

Cabassa has alleged sufficient facts supporting a plausible claim of deliberate indifference against Badger. As previously discussed, Cabassa's visual impairments and arthritis constitute serious medical needs. Cabassa told Badger that the bright lights in the mess-hall caused him great pain,[13] which served as the underlying reason for requesting a feed-in-cell status. Compl. ¶ 6(85). Construing the facts liberally, it is clear that the medical records also demonstrate Cabassa's difficulty in ambulating. Cabassa further alleged that Badger entered inaccurate information in his AHR and told Miller that she refused to make nurses deliver pain relief medication to his cell. Compl. ¶¶ 6(87), (90). Reading these facts

---

[13]Cabassa's medical records outline his proclivity for migraines and photophobia. See Ex. I, Cabassa Medical Eye Clinic Record, 1984–2012 at 2.

in the light most favorable to Cabassa, Badger lied about Cabassa's health status, refused to provide him with pain medications that she knew he required, and prevented Cabassa from receiving medications from other medical personnel by prohibiting them from delivering the medications. These allegations are sufficient to show that Badger intentionally interfered, denied, or delayed treatment that was previously prescribed to Cabassa, constituting deliberate indifference.

Accordingly, defendants' motion on this ground should be denied.


## 5. First Amendment

Cabassa asserts that certain defendants violated his constitutional right of access to the courts. Compl. at 53. He specifically alleged that defendants Oshier, Miller, Maxon, Johnson, and Lecuyer, between September 2009 and March 2011, failed to provide him with "a new contact and gradient tinted glasses," which served as the proximate cause to the dismissal of two of lawsuits. Id.

Prisoners have a constitutional right of access to the courts. Lewis v. Casey, 518 U.S. 343, 346 (1996). This right is implicated when prison officials "actively [interfer[e] with inmates' attempts to prepare legal documents . . . or file them . . . ." Id. at 350 (citing cases). The plaintiff must further allege that the defendant "took or was responsible for actions that 'hindered [his] efforts to pursue a legal claim.'" Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). While only minimal assistance to file legal claims is required of prison officials, courts have cited Lewis to support "the right to 'proceed with a legal claim' . . . suggest[ing], at least, that pro se inmates should have the means to defend

against dispositive motions and to prepare for trial." <u>Arce v. Walker</u>, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999) (listing cases).  An inmate would sufficiently state a denial of access to the courts claim by stating that a prison practice prevented him from "raising an argument or asserting a claim in his pleadings, in response to a dispositive motion . . . ."  <u>Id.</u>

The scope of an access to courts claim is limited by two requirements.  First, a prison regulation or practice that impinges on an inmate's constitutional right must be upheld if it is reasonably related to a legitimate penological interest.  <u>Lewis</u>, 518 U.S. at 361; <u>Arce</u>, 58 F. Supp. 2d at 44.  Second, a showing of an actual injury is required, which "is not satisfied by just any type of frustrated legal claim," because the Constitution guarantees only the tools that "inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."  <u>Collins v. Goord</u>, 438 F. Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting <u>Lewis</u>, 518 U.S. at 355). "Impairment of any <u>other</u> litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  <u>Id.</u>

Here, Cabassa directed the Court's attention to his two lawsuits, <u>Cabassa v. Smith</u>, 9:06-CV-852, and <u>Cabassa v. Smith</u>, 9:08-CV-0480, contending that they were dismissed because he was denied proper visual aids to see and prepare opposition papers, and as a result, was unable to timely file those papers.  Cabassa Letter (Dkt. No. 46-1) at 4–6. Viewing the facts in light most favorable to the plaintiff, Cabassa has stated a plausible claim that Oshier, Miller, Maxon, Johnson, and Lecuyer, between September 2009 and March 2011, actively interfered with his right to prepare or file legal documents by denying him the means of seeing and preparing opposition papers to dispositive motions.  Evidence supports the inference that Oshier, Miller, Maxon, Johnson, and Lecuyer had notice that

33

grievances were filed against them for the denial of visual aids, serving as a connection between Cabassa's complaints and his ability to conduct litigation. Grievance dated 12/30/09 (Dkt. No. 47-6) at 8. However, Cabassa should specifically replead the facts surrounding his inability to raise an argument or claim in the dismissed lawsuits because defendants denied his requested accommodations for his visual impairments, the reason behind the denial of accommodations, and any actual injuries, namely that regarding his other lawsuits and their dismissals, which resulted.

Accordingly, it is recommended that Cabassa file an amended complaint that contains all relevant facts regarding this First Amendment access to courts claims against defendants Oshier, Miller, Maxon, Johnson, and Lecuyer.

### C. ADA and Rehabilitation Act Claims

### 1. Eleventh Amendment

In addition to asserting First and Eighth Amendment claims, Cabassa asserted that defendants Miller, Johnson, and DOCCS violated his rights under Title II of the ADA and § 504 of the Rehabilitation Act. Defendants maintain that Title II and § 504 proscribe individual liability of individual defendants. Herzog v. McLane Northwest, Inc., 999 F. Supp. 274, 276 (N.D.N.Y. 1998) (citing cases); see also Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (finding that the same standards and analysis are used for an ADA claim and a claim under the Rehabilitation Act). As such, defendants are correct in their assertion that Cabassa's claims under the ADA and the Rehabilitation Act against defendants in their individual capacities are foreclosed.

The Court recalls that Cabassa sued defendants both in their individual and official capacities.  Defendants cite Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) as support for arguing that Eleventh Amendment immunity also bars ADA and Rehabilitation Act claims against individual defendants in their official capacities.[14] Defs.' Mot. to Dismiss at 17.  Because Cabassa's claims for monetary damages against DOCCS employees in their official capacities act as the functional equivalent of seeking damages directly from the State of New York, the issue here becomes whether the Eleventh Amendment protects the states from liability under Title II of the ADA and § 504 of the Rehabilitation Act.

First, turning to the issue of whether the Eleventh Amendment protects states from liability under Title II, the Second Circuit in Garcia found that Title II incorporated a judicially implied private right cause of action by referencing the remedial scheme of the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, thereby allowing the Court latitude to "fashion the scope of [the] implied right."  Garcia, 280 F.3d at 111–12 (citations omitted).  The Second Circuit concluded that Title II claims against states for monetary damages would comport with the Eleventh Amendment if a plaintiff establishes that a "Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability."  Id. at 111.  Here, Cabassa sues the individual defendants in their official capacities for monetary damages.  As Garcia only imposes a limitation on the scope of the available monetary remedy against states, the Eleventh Amendment does not

_____

[14]For this proposition, defendants cite to a portion of Garcia that merely served as a description of the arguments as presented by the defendants-appellees in Garcia.  See Supplemental Br. for Defs-Appellees, n.1, Mar. 23, 2001.

bar Cabassa's ADA claim against defendants in their official capacities for violations motivated by either discriminatory animus or ill will. Accordingly, defendants' motion on this ground is denied.

The Garcia opinion is also instructive on the viability of Cabassa's Rehabilitation Act claims against defendants in their official capacities. In Garcia, the Second Circuit found that while Congress failed to properly abrogate Eleventh Amendment immunity in § 504 under § 5 of the Fourteenth Amendment, Congress may require a state to agree to waive its sovereign immunity as a condition of accepting federal funds. Garcia, 280 F.3d at 113. Since Garcia, courts in this Circuit have disagreed as to the date when New York effectively waived its sovereign immunity—whether the date is after Garcia was decided or when the U.S. Supreme Court decided Bd. of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001) on February 25, 2001, which held that because Title I of the ADA exceeded Congress's authority under § 5 of the Fourteenth Amendment, the Eleventh Amendment bars suits against states under that Title. See Doe v. Goord, No. 04-CV-0570 GBD AJP, 2004 WL 2829876, *16 (S.D.N.Y. Dec. 10, 2004) (listing cases to demonstrate a split on the controlling date for the waiver of sovereign immunity).[15] Using either date, New York has waived its sovereign immunity for purposes of Cabassa's claims under the Rehabilitation Act because Cabassa's claims began on October 9, 2008, well after both Garcia and Garrett were decided. Accordingly, defendants' motion on this ground should also be denied.

---

[15]All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

## 2. Americans with Disabilities Act

Cabassa contends that defendants Miller and Johnson, in their official capacities,

violated his rights under the ADA by depriving him accommodating showers and defendant

DOCCS violated his rights under the ADA by denying him transfer to a sensorially disabled

facility. The ADA "applies to inmates in state prisons." Beckford v. Portuondo, 151 F.

Supp. 2d 204, 220 (N.D.N.Y. 2001) (citations omitted). To state a prima facie claim under

the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a

physical or mental impairment . . . substantially limits one or more of the major life activities

of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is]

being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test . . . First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (internal citations omitted).

A major life activity is defined as "seeing, . . . walking, standing, . . . reaching, lifting,

bending, . . . interacting with others, . . . ." 29 C.F.R. § 1630.2(i)(1).

The Second Circuit has held that it is important to

> distinguish[] between (i) making reasonable accommodations to
> assure access to an existing program and (ii) providing
> additional or different substantive benefits . . . [since] the
> disability statutes do not require that substantively different
> services be provided to the disabled, no matter how great their
> need for services may be.  They require only that covered
> entities make "reasonable accommodations" to enable
> "meaningful access" to such services as may be provided,
> whether such services are adequate or not.

Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (citations omitted).

Cabassa qualifies as an individual with disabilities.  Cabassa suffers from visual

impairments, which he alleged substantially limits his ability to see and interact with other

inmates.  Compl. ¶¶ 6(5)–(6); Cabassa Decl. ¶ 36; Irizarry Decl. at 75.  Cabassa also

suffers from ambulatory impairments, which substantially limits his ability to walk, do heavy

lifting, climb, and bend.  Compl. ¶¶ 6(29), (53)–(54).  There is an extensive record of both

impairments in which treating physicians view Cabassa as having such impairments.  See

Ex. I–V (attached to Cabassa Decl.).  Cabassa alleged that he was denied the use of

accommodating showers and transfer to a facility where accommodations are more readily

available, both of which constitute a denial of benefits of services or programs by the state.

The Second Circuit has cautioned that "when addressing a pro se complaint, a district 'court

should not dismiss without granting leave to amend at least once when a liberal reading of

the complaint gives any indication that a valid claim might be stated.'"  Thompson v. Carter,

284 F.3d 411, 416 (2d Cir. 2002) (quoting Branum v. Clark, 927 F.2d 698, 705 (2d Cir.

1991)).  Cabassa's complaint, if properly pled, may state a plausible ADA claim against

DOCCS as well as Miller and Johnson in their official capacities presuming that their denials

of accommodating showers and transfer to another facility were motivated by animus or ill

38

will based on his disabilities.

Accordingly, it is recommended that Cabassa file an amended complaint alleging the remaining ADA claims against DOCCS and Miller and Johnson in their official capacities.

### 3. Rehabilitation Act

Cabassa alleged Rehabilitation Act causes of action against the same defendants, based on the same claims, as under the ADA claims.  The Rehabilitation Act protects any "qualified individual with a disability . . . [from] be[ing] excluded from the participation in, . . . [or] denied the benefits of," any federally funded program "solely by reason of his or her disability . . . ."  29 U.S.C. § 794(a); <u>see</u> <u>also</u> <u>Clarkson</u>, 898 F. Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").  As discussed, both state and individual defendants can be held liable under the Rehabilitation Act in their official capacities.  Here, if properly pled, Cabassa might be able to state plausible Rehabilitation Act claims against DOCCS, or Miller or Johnson in their official capacities, specifically that the denials of  transfer to another facility and accommodating showers were based on Cabassa's disabilities.

Accordingly, it is recommended that Cabassa file an amended complaint alleging the remaining Rehabilitation Act claims against DOCCS and Miller and Johnson in their official capacities.

### D.  "John Doe" Defendants

Among the defendants named in the complaint are eight "John Doe" defendants.  None of these defendants have been otherwise identified or served with process and have not

otherwise appeared in the action.  The complaint was filed in this district on October 17, 2011.  Dkt. No. 1.  Cabassa was granted leave to proceed in forma pauperis on December 21, 2011.  Dkt. No. 6.  This obligated the United States Marshals Service to complete service of process on Cabassa's behalf, but Cabassa retains the duty to advise the Marshals Service of the last known address of all defendants to facilitate completion of service.  Where a defendant has not been served with process within 120 days of the filing of the complaint, the complaint must be dismissed without prejudice as to that defendant or the court must order "service be made within a specified time."  Fed. R. Civ. P. 4(m).  If, however, the plaintiff demonstrates good cause for service failures, the Court must also extend the time to serve.  Id.  Additionally, the Second Circuit has held that "district courts have discretion to grant extensions even in the absence of good cause."  Zapata v. City of New York, 502 F.3d 192, 196 (2d Cir. 2007).

More than the required 120 days have passed since the complaint was filed herein and the eight "John Doe" defendants have not been served.  However, Cabassa has not yet enjoyed the opportunity to conduct discovery to assist him in determining the identity and location of any of the unserved defendants.  In deference to Cabassa's in forma pauperis status as well as the survival of certain claims, he should be permitted time during discovery to attempt to identify and locate the "John Does" defendants.

Accordingly, it is recommended that Cabassa be permitted time during discovery to identify and locate any of the unserved John Does.


### III.  Conclusion

For the reasons stated above, it is hereby:

40

1. **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 34) be:

   A. **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities and defendant DOCCS; (2) personal involvement defense against Cabassa's § 1983 claims against Patnode; and (3) ADA and Rehabilitation Act claims against defendants Miller and Johnson in their individual capacities.

   B. **DENIED** as to the (1) statute of limitations defense against Cabassa's § 1983 claims; (2) personal involvement defense against Cabassa's § 1983 claims against LaValley, Artus, Ezero, Lecuyer, and Miller; (3) Eighth Amendment medical deliberate indifference claims against defendants Blaise, Oshier, Johnson, Lee, Jennette, and Badger; (4) ADA and Rehabilitation Act claims against defendants Miller and Johnson in their official capacities; and (5) First Amendment denial of access to court claims against defendants Oshier, Miller, Maxon, Johnson, and Lecuyer.

2. **RECOMMENDED** that defendant Patnode be dismissed.

3. **RECOMMENDED** that the Clerk's Office make necessary changes to the Docket to reflect the actual names of defendants Jennette and Ezero.

4. Further **RECOMMENDED** that, for the sake of judicial efficiency, the surviving claims and defendants, specifically Cabassa's:

   A. Eighth Amendment

     i.   Use of force claims against defendants Milburn and John

         Doe A through F; and

     ii.   Medical deliberate indifference claims against defendants

         Blaise, Oshier, Johnson, Lee, Badger, Jennette, Miller, Ezero,

         LaValley, Maxon, John G. Doe, and John H. Doe; and

   B.  First Amendment

     i.   Retaliation claims against defendants Oshier, Miller, Maxon,

         Johnson, Lecuyer, Ezero, Jennette, Artus, and LaValley; and

     ii.   Denial of access to courts claims against defendants Oshier,

         Miller, Maxon, Johnson, and Lecuyer; and

   C.  ADA and Rehabilitation Act claims against defendant DOCCS and

     defendants Miller, Johnson, John G. Doe, and John H. Doe in their

     official capacities;

should be consolidated into an amended complaint, which should contain all relevant

facts regarding these claims.

   Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892

F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).

Dated:  October 30, 2012
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge