**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SAMUEL CABASSA,

                                        Plaintiff,

            v.                                              No. 11-CV-1237
                                                                 (MAD/CFH)

C. OSHIER, Clerk III, Clinton Correctional
Facility; D. ARTUS, Superintendent, Clinton
Correctional Facility; T. LaVALLEY,
Superintendent, Clinton Correctional Facility;
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; E. BLAISE,
Registered Nurse, Clinton Correctional
Facility; S. MILLER, Nurse Practitioner,
Clinton Correctional Facility; M. MAXON,
Optometrist, Clinton Correctional Facility;
JENNETTE, Correctional Officer, Clinton
Correctional Facility; EZERO, Correctional
Officer, Clinton Correctional Facility;
J. Millburn[1], Correctional Officer, Clinton
Correctional Facility; M. PATNODE, Deputy
Superintendent for Programs, Clinton
Correctional Facility; B. LECUYER, Nurse
Administrator, Clinton Correctional Facility;
BADGER, Registered Nurse, Clinton
Correctional Facility; K.M. LEE, Medical
Doctor, Clinton Correctional Facility;
V. JOHNSON, Medical Doctor, Clinton
Correctional Facility; JOHN DOE A. through
F., Correctional Sergeants, Clinton
Correctional Facility; JOHN DOE G. and H.,
DOCS Utilization Review Committee,
Albany,

                                        Defendants.

_____

_____

        [1] Officer "Millburn" is spelled Kilburn in his Acknowledgment of Service as well as
defendants' motion for partial summary judgment.  Dkt. Nos. 17, 93.  The Court proceeds
with the latter spelling and will direct the Clerk's office to make the necessary changes to
the docket to reflect defendant's actual name.

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                              **OF COUNSEL:**

SAMUEL CABASSA
Plaintiff Pro Se
Wende Correctional Facility
Wende Road, P.O. Box 1187
Alden, New York 14004-1187

HON. ERIC T. SCHNEIDERMAN          KEVIN M. HAYDEN, ESQ.
Attorney General for the                   Assistant Attorney General
    State of New York
The Capitol
Albany, New York 12224-0341
Attorney for Defendants

## REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff <u>pro se</u> Samuel Cabassa, an inmate who was, at all relevant times, in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,

DOCCS, fourteen DOCCS employees, and eight John Does violated his constitutional rights

under the First and Eighth Amendments.  Dkt. No. 1 ("Compl.") at 11, 52-56.  Plaintiff also

alleges that the defendants violated his rights under Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u>, and the Rehabilitation Act ("RA"), 29

U.S.C. § 794.  <u>Id.</u> at 52-56.  At all relevant times, plaintiff was incarcerated at Clinton

Correctional Facility ("Clinton").  Plaintiff commenced this action on October 17, 2011,

seeking compensatory and punitive damages.  Compl. at 1, 57.  Defendants filed a motion

---

[2]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636 (b) and N.D.N.Y.L.R. 72.3 (c).

for dismissal on May 30, 2012. Dkt. No. 34. On March 21, 2013, defendants' motion for

dismissal pursuant to FRCP 12(B)(6) was granted as to all § 1983 claims against

defendants in their official capacities, all § 1983 claims against DOCCS, as well as the ADA

and RA claims against defendants Sheryl Miller and Dr. Vonda Johnson, in both their

individual and official capacities. Dkt. No. 52. Plaintiff was also directed to file an amended

complaint as to: (1) the Eighth Amendment medical indifference claims against defendants

Christina Oshier and Dr. Johnson; and (2) the First Amendment denial of access to courts

claims against defendants Oshier, Miller, Dr. Mark Maxon, Dr. Johnson, and Brian Lecuyer.

Dkt. No. 49 at 28, 30, 34. Presently pending is defendants' motion for partial summary

judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56(a).[3] Dkt No.

93. Plaintiff did not oppose the motion. For the following reasons, it is recommended that

defendants' motion be granted in part and denied in part.


## II. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.

See subsection III(A) infra. Plaintiff's allegations took place over a period of approximately

two years and two months.


### A. Plaintiff's Recitation of Facts

### 1. Vision-Related Issues

---

[3] Defendants are not moving for summary judgment on the Eighth Amendment claim of excessive force against defendant John Kilburn (incorrectly sued as "Millburn"). Dkt. No. 93 at 1.

On October 9, 2008, one day after he was transferred to Clinton, plaintiff was seen by defendants Elizabeth Blaise, a registered nurse, and Christina Oshier, a clerk, and informed them that he suffers from complete blindness in his left eye and that he is "severely visually impaired in his right eye." Compl. ¶¶ 6(2)-(3). Plaintiff told Blaise and Oshier that he wears a contact lens over his right eye to correct his "high myopia" and that he suffers from photophobia,[4] which requires him to wear a pair of non-prescription glasses with a plastic or polycarb lens over his right eye. Id. ¶ 6(2). The lens must also have a "60% grey gradient tint to control photophobia." Id. He requested a medical permit to wear his personal pair of tinted glasses. Id. ¶ 6(3). According to plaintiff, both Blaise and Oshier accused plaintiff of lying about suffering from photophobia in an attempt to wear his own "fancy designer sunglasses." Id. ¶ 6(4). Plaintiff then told Blaise that if he were forced to give up his glasses, he would run the risk of being struck by something in his "good [right] eye" and that he would suffer "intolerable pain and migraine headaches" from exposure to bright lights. Id. ¶ 6(6). Oshier ordered plaintiff to remove his personal glasses and informed him that he was prohibited from wearing them while at Clinton. Id. ¶ 6(5). Plaintiff then told Oshier that he intended to file a grievance against her, at which point Oshier allegedly threatened plaintiff. Id. ¶¶ 6(8)-(9). Upon returning to his housing block, defendant David Ezero, a corrections officer, threatened plaintiff and, allegedly, intended to assault plaintiff had plaintiff not retreated to his cell and locked himself in before Ezero could assault him. Id. ¶¶ 6(10)-(11).

Plaintiff mailed a letter complaining about the actions of defendants Blaise, Oshier,

---

[4] Plaintiff describes photophobia as "sensitivity to bright natural or artificial lighting." Compl. ¶ 6(2).

and Ezero to defendant Dale A. Artus, Superintendent of Clinton, on October 10, 2008. Compl. ¶ 6(12). Artus referred the complaint to defendant Thomas LaValley, the First Deputy Superintendent at Clinton. Id.

On October 12, 2008, plaintiff informed an unnamed nurse that he could no longer pick up his nighttime medication because the walk to the hospital exposed him to bright lights that caused migraines and "excruciating eye pain." Compl. ¶ 6(13)-(14). Plaintiff completed a refusal form, listing the reasons why he could not travel to the hospital to pick up his medication, and requested that his nighttime medication be delivered to his cell. Id. ¶ 6(15). Defendant Sheryl Miller, a nurse practitioner, did not grant his request and instead discontinued his nighttime medication. Id. ¶ 6(16). On October 20, 2008, plaintiff sent a letter to defendant Dr. Vonda Johnson requesting: (1) a temporary permit to wear his personal tinted glasses; and (2) delivery of his nighttime medication to his cell. Compl. ¶ 6(17)-(18).

On October 21, 2008, plaintiff met with Miller and told her that defendants Blaise and Oshier had denied him a medical permit to wear his own tinted glasses. Compl. ¶ 6(19). Plaintiff showed Miller his medical records supporting a diagnosis of photophobia, prescriptions for tinted glasses and non-prescription glasses, along with medical permits from other prisons. Id. After reviewing plaintiff's records, Miller directed Oshier to issue tinted glasses to plaintiff. Id. ¶ 6(22). Oshier complied and issued plaintiff a medical permit and a large pair of "100% black sunglasses" resembling "welding glasses." Id. ¶ 6(23). Miller also placed plaintiff on medical feed-in-cell status and arranged for his nighttime medication to be delivered to his cell. Id. ¶ 6(24).

Plaintiff was seen by defendant Dr. Mark Maxon, an optometrist, on November 7, 2008. Compl. ¶ 6(30). Dr. Maxon told plaintiff that he heard he was a "troublemaker" and that plaintiff should "think twice about giving Oshier a difficult time." Id. ¶¶ 6(31)-(32). He also told plaintiff that if he files a grievance or a lawsuit, he would "fix" plaintiff's eye chart so that he would not receive the correct prescription. Id. ¶ 6(39). Plaintiff filed a grievance against Dr. Maxon and Oshier regarding this incident, and also sent a letter regarding the incident to defendant Artus. Id. ¶ 6(40).

Defendant LaValley visited plaintiff in his cell on November 25, 2008. Compl. ¶ 6(47). LaValley told plaintiff that Dr. Maxon was only trying to "look out for" plaintiff and help him. Id. Plaintiff requested to wear his own tinted glasses as a "reasonable accommodation" until he received a state-issued pair with tinted lenses, as his solar shield sunglasses were too dark. Id. ¶ 6(49).

Plaintiff alleges that on December 31, 2008, Dr. Maxon refused to allow plaintiff to wear his own prescription sunglasses until he could obtain a state-issued pair. Compl. ¶ 6(81). Instead, Dr. Maxon prescribed plaintiff transitional lenses, despite plaintiff's protestation that he would suffer severe migraine headaches and eye pain were he to use the transitional lenses. Id. ¶¶ 6(81)-(82).

At an appointment with defendant Miller on March 3, 2009, plaintiff asked when he would be receiving his state-issued transitional lens glasses. Compl. ¶ 6(84). Miller called Oshier and relayed plaintiff's inquiry. Id. Oshier informed Miller that plaintiff would be waiting at least two weeks for the glasses. Id. Plaintiff saw defendant Dr. Maxon on May 9, 2009, and told him that the transitional glasses supplied to him were causing him to suffer from double vision and migraines. Compl. ¶ 6(88).

On September 14, 2009, a retinal specialist, Dr. Gigante, diagnosed plaintiff with a cataract growth on his right eye that was causing plaintiff's double vision and migraines. Compl. ¶ 6(92). Dr. Gigante did not recommend surgery at the time because of the high-risk involved but did recommend tinted glasses to reduce the glare plaintiff was experiencing. Id. ¶¶ 6(92)-(93). After plaintiff's appointment with Dr. Gigante, Miller noted in plaintiff's Ambulatory Health Records ("AHR") that plaintiff had already received tinted glasses in May 2009. Id. ¶ 6(93).

Plaintiff saw Dr. Gigante again on December 14, 2009. Compl. ¶ 6(95). Dr. Gigante informed plaintiff that the cataract in his right eye was growing and that surgery may be needed despite its high-risk nature. Id. Dr. Gigante recommended a new contact lens, safety glasses with a gradient tint, and that plaintiff be moved to a facility housing visually-disabled inmates. Id. On January 11, 2010, plaintiff inquired about the tinted glasses and new contact lens recommended by Dr. Gigante, as well as Dr. Gigante's recommendation that he be transferred to a sensorially-disabled facility. Id. ¶ 6(101). Dr. Maxon agreed that plaintiff belonged in a sensorially-disabled facility but refused to carry out the recommendations. Id. ¶¶ 6(102)-(103). On April 12, 2010, plaintiff met with Dr. Gigante again. Id. ¶ 6(96). She noted that plaintiff's cataract had advanced since plaintiff's last visit, reiterated the fact that cornea surgery would be high-risk, and recommended that plaintiff see a cornea specialist. Id.

On June 4, 2010, plaintiff saw a cornea specialist who recommended that plaintiff receive permanent gradient-tinted glasses and a new contact lens, pending surgery. Compl. ¶ 6(100). Plaintiff received new contact lenses from Dr. Maxon on December 3, 2010. Compl. ¶ 6(110). He received his gradient-tinted glasses on March 27, 2011, after

his transfer to Wende Correctional Facility.  Id. ¶ 6(112).

### 4.  Alleged Assault on December 12, 2008

Plaintiff alleges that, on December 12, 2008, he was physically assaulted by defendant John Kilburn, a corrections officer, and John Does A-F, also corrections officers. Compl. ¶¶ 6(68)-(74).  At that time, plaintiff was "dragged" to the prison infirmary and taken to an observation room in the Mental Health Observation Unit.  Id. ¶¶ 6(72), 6(74).  Plaintiff alleges that the officers threatened him for filing grievances as they assaulted him.  Id. ¶ 6(75).  After seventy-two hours, plaintiff was examined by an unnamed psychiatrist and released back to his cell.  Id. ¶ 6(80).  He sustained injuries to his legs, knees, shoulders, chest, neck, and lower back.  Id. ¶ 6(79).

### 3.  Pain Management and Mobility Issues

On October 20, 2008, plaintiff sent a letter to Dr. Johnson requesting a medical permit allowing him to shower in his housing unit due to pain in his hips, knees, and back, which prevented him from using stairs.  Compl. ¶ 6(18).  The next day, defendant Miller placed plaintiff on medical feed-in-cell status and arranged for his nighttime medication to be delivered to his cell.  Id. ¶ 6(24).  Plaintiff further complained about his difficulty traveling to the bathhouse due to the pain in his knees and hips, the layout and conditions of the bathhouse, and his perceived risk to his safety.  Id. ¶¶ 6(25)-(27).  Miller ordered that plaintiff receive medical shower status so that he could shower in his housing unit.  Id. ¶ 6(28).

On October 31, 2008, plaintiff, by letter, requested that Miller issue him a medical order preventing him from performing any heavy lifting. Compl. ¶ 6(29). Plaintiff complained that he could not perform any heavy lifting because he walks with a cane and when he does try to lift heavy objects, he experiences pain and discomfort in his left shoulder, back, hips and knees. Id. Miller did not respond. Id.

On November 19, 2008, plaintiff moved to a different housing unit within Clinton. Compl. ¶ 6(41). Upon arrival, defendant Kevin Jennette, a corrections officer, refused to accept plaintiff's medical pass for feed-in-cell status. Id. The next morning, Blaise, upon approval from Miller, issued plaintiff another medical pass for feed-in-cell status. Id. ¶ 6(44) Jennette refused to accept the pass, telling plaintiff that Blaise could not issue it. Id. ¶ 6(45). Jennette told plaintiff that he was putting him down for sick call and that he was to tell Blaise that she could not issue plaintiff a feed-in-cell pass. Id. Plaintiff refused to do so. Id. On November 24, 2008, plaintiff sent a letter to Miller, telling her that Jennette was "starving" him by not honoring his feed-in-cell medical pass and also requesting delivery of his nighttime medication. Id. ¶ 6(46).

On November 25, 2008, after denying plaintiff's requests to wear his personal glasses, LaValley informed plaintiff that Jennette had rescinded his medical pass for feed-in-cell status. Id. ¶ 6(49)-(50). The next morning, while delivering plaintiff's morning medication, defendant Dawn Badger, a nurse, confirmed that Jennette had rescinded plaintiff's feed-in-cell status. Id. ¶ 6(51). Badger also informed plaintiff that delivery of his nighttime medication had been terminated. Id. That day, plaintiff received a note from the nursing staff informing him that he has been deemed able to report to the mess hall for meals, as there was nothing medically preventing him from doing so. Id. ¶ 6(53).

Plaintiff sent a letter to Brian Fischer, DOCCS Commissioner, on December 1, 2008, stating that defendants Dr. Maxon, Blaise, Oshier, Jennette, Artus, and LaValley were deliberately subjecting him to a hunger strike. Compl. ¶ 6(54). On December 2, 2008, he filed a grievance alleging that: (1) Artus and LaValley were condoning acts of discrimination committed against plaintiff by other defendants; (2) Jennette did not honor his medical feed-in-cell pass and further forced the medical staff to rescind the permit; and (3) he was being subjected to an involuntary hunger strike. Id. ¶ 6(55).

On March 3, 2009, plaintiff saw Miller and complained to her about lingering pain from the December 12, 2008 alleged assault. Compl. ¶ 6(83). He requested to receive nighttime medication and told Miller that he would travel to the hospital to receive it. Id. ¶ 6(83). Plaintiff states that, after this appointment, he began traveling to the hospital to receive his nighttime medication and these trips "segue[d]" into his traveling to the mess hall to receive evening meals. Id. ¶ 6(85). Plaintiff subsequently completed a refusal form for his nighttime medication on April 30, 2009, complaining of the bright lights in the holding pen and mess hall and his "mobility impairments." Id. ¶¶ 6(85)-(86). On the same form, he requested what he referred to as a "reasonable accommodation" in the form of delivery of his nighttime medication to his cell. Id. ¶ 6(86). He submitted the refusal form to defendant Badger. Id. Plaintiff's morning and nighttime medications were discontinued on May 1, 2009. Id. ¶ 6(87). On July 31, 2009, plaintiff asked Miller why both his morning and nighttime medications were discontinued when he had only asked for his nighttime medication to be discontinued if it could not be delivered to his cell. Compl. ¶ 6(90). Miller replied that Badger refused to have the nurses make the deliveries. Id.

On August 28, 2009, non-party Dragos Macelaru, an orthopedist, recommended

cortisone injections and the continuation of pain medication for plaintiff's knee pain. Compl. ¶ 6(91). Miller did not immediately implement the recommendations. Id.

On August 27, 2010, plaintiff sent a letter to defendant Dr. Johnson, alleging that defendant Kang Maeng Lee, a medical doctor, refused to provide him with pain medication, despite his unbearable pain. Compl. ¶ 6(105). Plaintiff does not specify in which body parts he was experiencing such pain. See id. On September 10, 2010, plaintiff met with Dr. Macelaru, who performed cortisone injections on both of plaintiff's knees and recommended that plaintiff take Meloxicam and Tylenol. Id. ¶ 6(106). On December 20 and 29, 2010, plaintiff sent letters to Dr. Johnson complaining that Lee refused to administer pain medication to him per Dr. Macelaru's recommendation. Compl. ¶ 6(109).

## 2. Requests for Transfer to a Sensorially-Disabled Facility

On May 12, 2010, plaintiff's counselor, Mr. Rodriguez, advised him to submit a Request for Reasonable Accommodations form to defendant Max Patnode, Deputy Superintendent for Programs, to request a transfer to a facility for sensorially-disabled inmates. Compl. ¶ 6(97). Plaintiff requested the transfer and also included demands for magnifiers, sunglasses, a new contact lens, plain non-medical sunglasses with a forty-five percent gradient tint, feed-in-cell and medical shower passes, and the restoration of morning and night medications. Id. ¶¶ 6(98)-(99). Plaintiff does not specify whether his request for medications included a request that they be delivered to his cell. Id. ¶ 6(99). Plaintiff received permits for feed-in-cell and medical showers from defendant Johnson on or about July 15, 2010. Id. ¶ 6(104).

On October 28, 2010, plaintiff sent a letter to Lucien LeClaire, Deputy Commissioner

of Correctional Facility Operations, and Joyce R. Carver-Jordan, Director of Classification and Movement, requesting that they expedite his transfer to a sensorially-disabled facility. Compl. ¶ 6(107). The next day, plaintiff received notice that his transfer request had been denied. Id. ¶ 6(108). Plaintiff was transferred to Wende Correctional Facility's Sensorially-Disabled Program on January 26, 2011. Compl. ¶ 6(111).

## B. Defendants' Recitation of Facts

### 1. Vision-Related Issues

Plaintiff arrived at Clinton on or about October 8, 2008. Aff. of Charles Simpson, N.A. ("Simpson Aff.") ¶ 13 (Dkt. No. 93-6). At that time, plaintiff was wearing a pair of non-state-issued designer sunglasses. Aff. of Christina Oshier ("Oshier Aff.") ¶ 9 (Dkt No. 93-8). Oshier told plaintiff to remove the sunglasses pursuant to DOCCS' Health Services Policy Manual ("HSPM"), which prohibits inmates' use of non-state-issued glasses. Id. ¶¶ 5, 7. Oshier did not confiscate the sunglasses. Id. ¶ 10. Plaintiff requested to wear his personal glasses on October 9, 2008, and that request was denied. Simpson Aff. ¶ 15. Plaintiff wrote a letter to Dr. Johnson on October 20, 2008, asking whether the lenses from the state-issued glasses offered to him could be mounted in his personal frames. Id. ¶ 18.

Dr. Maxon first examined plaintiff on October 21, 2008, diagnosing him with several conditions including a detached retina, high degenerative myopia, and the use of a contact lens. Aff. of Dr. Mark R. Maxon, O.D. ("Maxon Aff.") ¶ 14 (Dkt. No. 93-10). These conditions have caused plaintiff blindness in his left eye and extreme nearsightedness in his right eye. Id. Dr. Maxon prescribed dark solar shield glasses to plaintiff, to be worn over his

-12-

contact lens and spectacle eyeglasses.  Id. ¶ 15.  Dr. Maxon reviewed plaintiff's records and determined that he did not suffer from chronic photophobia.  Id. ¶ 18.

On November 7, 2008, plaintiff had a scheduled appointment with Dr. Maxon to ascertain whether plaintiff should receive a prescription for safety glasses.  Simpson Aff. ¶ 21.  At that appointment, plaintiff was "challenging, confrontational and decided to leave during the exam."  Id.  Dr. Maxon prescribed the safety glasses that day.  Id.  Plaintiff later requested that Dr. Maxon prescribe him glasses with lighter lenses as he felt that the solar shield glasses were too dark.  Maxon. Aff. ¶ 19.  Although Dr. Maxon's examinations revealed that lighter-tinted glasses were not medically necessary, he prescribed poly-carb transitional lenses to plaintiff in December 2008 to appease his complaints.  Id.  Plaintiff received a permit allowing him to wear the transitional lenses on February 27, 2009, and returned his solar shield glasses on March 6, 2009, signing a note which indicated that he had received the transitional lenses.  Simpson Aff. ¶¶ 27, 30.  Plaintiff later complained that the poly-carb transitional lenses were not dark enough, but testing completed on May 18, 2009 showed that the lenses were accurate, and further adjustments were not medically necessary.  Maxon Aff. ¶ 20.

Plaintiff was examined by Dr. Gigante, a consultant, on September 14, 2009.  Simpson Aff. ¶ 40.  Dr. Gigante diagnosed plaintiff with a monocular cataract and recommended that he be prescribed tinted glasses to reduce glare.  Id. ¶¶ 40-41.  Plaintiff requested darker lenses on November 4, 2009, during an examination by medical personnel.  Id. ¶ 43.  He was examined by Dr. Gigante again on December 14, 2009.  Id. ¶ 46.  At that time, Dr. Gigante recommended that plaintiff receive gradient permanent tint glasses and that DOCCS consider transferring plaintiff to a sensorially-disabled facility.  Id.

-13-

At plaintiff's next appointment with Dr. Gigante, on April 12, 2010, he was diagnosed with myopic degeneration and an advancing cataract. Id. ¶ 48. Dr. Gigante recommended a follow-up appointment in four months and an examination by a cornea specialist. Id.

Plaintiff submitted a request for a transfer to a sensorially-disabled facility, along with requests for a sighted guide, "large print", a magnifier, a lamp, and indoor sunglasses on May 21, 2010. Simpson Aff. ¶ 49. Dr. Johnson verified this request. Id. Patnode modified the request, directing DOCCS' Central Office to review plaintiff's request. Id. While his transfer request was pending, Dr. Johnson provided plaintiff with passes for showers on the block and for meals to be delivered to his cell. Id. ¶ 52. These passes were issued on July 19, 2010. Id.

Plaintiff was seen by Dr. Eden, a cornea specialist, on June 4, 2010. Simpson Aff. ¶ 50. Dr. Eden diagnosed plaintiff with a monocular cataract and recommended that plaintiff undergo surgery. Id. Dr. Eden also recommended that plaintiff receive permanent tint glasses and contact lenses while he awaited the surgery. Id. Plaintiff completed a refusal form on July 1, 2010, refusing to undergo the surgery recommended by Dr. Eden. Id. ¶ 51. By that same form, plaintiff agreed to try a new contact lens and gradient-tinted glasses. Id.

Dr. Johnson wrote a letter to plaintiff, dated July 27, 2010, stating that she reviewed the recommendations from Drs. Eden and Gigante, and that Dr. Maxon would be examining plaintiff in August of 2010. Simpson Aff. ¶ 53. The letter also stated that Dr. Johnson would be providing a magnifying card to plaintiff. Id. Dr. Maxon prescribed permanent gradient tint glasses to plaintiff on August 26, 2010. Id. ¶ 55.

Plaintiff sent a letter to Dr. Johnson on October 28, 2010 complaining about the strength of his contact lens prescription and inquiring as to when he would receive new

contact lenses and new glasses.  Simpson Aff. ¶ 62.  Dr. Johnson responded to plaintiff by

letter on November 2, 2010, informing him that his contact lens had arrived at Clinton and

plaintiff would be scheduled for an appointment with Dr. Maxon for fitting and refraction of

his glasses.  Id. ¶ 63.  Plaintiff was seen by Dr. Maxon on December 3, 2010, at which time

he received his new contact lenses.  Id. ¶ 64.  Dr. Maxon performed an examination for the

refraction of plaintiff's glasses and prescribed forty-percent gray gradient poly-carb glasses.

Id.  Plaintiff requested that his new eyeglass lenses be placed in non-safety frames.  Id.

Plaintiff received his gradient-tinted glasses on March 27, 2011 at Wende Correctional

Facility.  Compl. ¶¶ 6(111)-(112).


### 2.  Plaintiff's Pain Management Treatment and Issuance of Medical Passes

When plaintiff arrived at Clinton on or about October 8, 2008, his notes indicated that

he had received permits for the use of (1) contact lenses; (2) darkened lenses; and (3) a

cane from his previous facility, Upstate Correctional Facility.  Simpson Aff. ¶ 13.  Plaintiff

received a prescription for Tylenol #3 upon his arrival at Clinton and received that

prescription at all times he was incarcerated at Clinton, except for the times he refused the

medication.  Id. ¶ 14.  On October 9, 2008, plaintiff was given a permit to use a cane and

wear a knee brace.  Id. ¶ 15.  On October 12, 2008, plaintiff completed a form refusing his

evening Tylenol #3 medication.  Id. ¶ 17.  He resumed receipt of this medication on October

21, 2008.  Id. ¶ 19.

In November 2008, plaintiff was approved for twice weekly physical therapy visits for

a period lasting four weeks for treatment of his left shoulder.  Simpson Aff. ¶ 23.  Plaintiff

attended three of the eight sessions.  Id.  He received a memorandum on November 25,

2008, informing him that he had no medical restrictions that would prevent him from traveling to the mess hall for meals. Id. ¶ 24.

Plaintiff was examined by Clinton's medical staff on March 3, 2009 because he was complaining of shoulder and knee pain. Simpson Aff. ¶ 28. On March 18, 2009, an x-ray was performed on plaintiff's right shoulder which revealed mild arthritic changes. Id. ¶ 32. At the beginning of April 2009, plaintiff was scheduled to attend physical therapy for his right knee, biweekly, for three weeks. Simpson Aff. ¶ 33. He attended six physical therapy sessions that month. Id.

On April 30, 3009, plaintiff completed another refusal form for his evening Tylenol # 3 medication. Simpson Aff. ¶ 34. Plaintiff wrote on the refusal form that the bright lights in the holding pen were causing him "intolerable pain". Compl. ¶¶ 6(85)-(86). Per plaintiff's refusal form, that medication was discontinued on May 1, 2009. Simpson Aff. ¶ 35. At this time, he received prescriptions for Diclofenac and Misoprostol, anti-inflammatory and pain relief medications. Id. On May 5, 2009, plaintiff later complained that the Diclofenac and Misoprostol were causing negative side effects and requested to be put back on the Tylenol #3 prescription regimen. Id. ¶ 36. His request was granted and he also continued to receive Tylenol #3 in the mornings. Id.

Plaintiff was examined by an orthopedic consultant on August 28, 2009. Simpson Aff. ¶ 39. Plaintiff complained of right knee pain, and the consultant diagnosed him with osteoarthritis of the right knee and recommended that plaintiff continue taking non-steroidal anti-inflammatory drugs ("NSAIDs") and that plaintiff receive a cortisone injection. Id. Plaintiff was later examined during sick call on October 16, 2009, and stated that Tylenol # 3 was not effective for his pain. Id. ¶ 42. On November 4, 2009, he was prescribed

Robaxin and Indocin to help alleviate his pain.  Id. ¶ 44.  At that time, medical staff ordered injections in his right knee, as well as an x-ray of his lumbar spine.  Id.  An x-ray performed on November 18, 2009 showed degenerative disc disease and facet joint arthropathy.  Id. ¶ 45.  On December 1, 2009, plaintiff was prescribed eight physical therapy sessions to treat his hip and knee pain.  Id. ¶ 47.  He attended all eight sessions.  Id.

On August 10, 2010, plaintiff received a prescription for Indomethacin, an NSAID drug that reduces pain and swelling.  Simpson Aff. ¶ 54.  He was again examined by an orthopedic consultant on August 28, 2010 and cortisone injections were again recommended.  Id. ¶ 56.  Id. ¶ 6(86).  Plaintiff received cortisone injections in both knees on September 10, 2010, and was directed to continue taking NSAID drugs.  Id. ¶ 58.

Plaintiff received an x-ray of both of his hips and his right knee on September 17, 2010.  The x-rays revealed mild degenerative disc disease in his hips and mild to moderate degenerative disc disease in his right knee.  Simpson Aff. ¶¶ 59-60.  He was prescribed Motrin for knee pain on September 21, 2010.  Id. ¶ 61.

Plaintiff complained to Dr. Johnson that Dr. Lee was not providing him with adequate care for his joint pain.  Simpson Aff. ¶ 65.  In a letter dated January 12, 2011, Dr. Johnson acknowledged receipt of plaintiff's complaints, and stated that he was receiving adequate prescriptions for managing arthritic joint pain.  Id.  Plaintiff was last treated by the Clinton medical staff on January 21, 2011.  Simpson Aff. ¶ 66.  At that time, he was prescribed Indocrin "for swelling, arthritis and pain relief."  Id.

### 3.  Personal Hygiene and Alleged Deprivation of Food

When plaintiff arrived at Clinton on or about October 8, 2008, he weighed 163

pounds.  Simpson Aff. ¶ 13.  When examined at sick call on February 3, 2009, he weighed

162 pounds.  Id. ¶ 26.  Further examinations showed that plaintiff weighed 171 pounds on

July 31, 2009 and 169 pounds on November 4, 2009.  Id. ¶¶ 38, 44.


### III.  Discussion[5]

The remaining claims asserted by plaintiff are that: (1) defendants Oshier, Artus,

LaValley, Blaise, Miller, Dr. Maxon, Lecuyer, Dr. Johnson, and Patnode violated his Eighth

Amendment rights by prohibiting him from using his personal sunglasses, denying him a

new contact lens and state-issued tinted glasses, and issuing him dark solar shield

sunglasses; (2) defendants Oshier, Miller, Dr. Maxon, Lecuyer, Dr. Johnson, and Patnode

violated his First Amendment right of access to the courts by denying him a new contact

lens and state-issued tinted glasses; (3) defendants Oshier, LaValley, Miller, Jennette, and

Badger violated his Eighth Amendment rights by denying or refusing to honor his feed-in-

cell status, which forced him to suffer involuntary starvation; (4) defendants Oshier,

LaValley, Miller, Dr. Maxon, Jennette, Ezero, Badger, and Dr. Johnson violated his Eighth

Amendment rights by interfering with the delivery of his medication to his cell; (5)

defendants Lee, Miller, and Dr. Johnson violated his Eighth Amendment rights by denying

him pain medication; (6) defendant DOCCS violated his rights under 42 U.S.C. § 12132, the

Americans with Disabilities Act ("ADA") and 42 U.S.C. § 794, the Rehabilitation Act ("RA"),

by denying his request for a transfer to a sensorially-disabled facility and denying him

---

[5]  All unpublished opinions cited to by the Court in this Report-Recommendation
and Order are, unless otherwise noted, attached to this Report-Recommendation and
Order.

reasonable accommodations; (7) defendants Oshier, Miller, Dr. Maxon, Dr. Johnson, Lecuyer, Ezero, Jennette, LaValley, and Patnode violated his First Amendment rights by retaliating against him for filing grievances; (8) Defendants Kilburn and John Does A through F violated his Eighth Amendment rights by using excessive force; and (9) defendants LaValley and Artus violated his First and Eighth Amendment rights by admitting him to the mental health observation unit, which resulted in retaliation in the form of an assault.  Compl. at 11, 52-56.

Defendants argue that summary judgment in their favor should be granted as to all claims, except plaintiff's Eighth Amendment excessive force claim against Kilburn.  Dkt. No. 93.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a), (c).  The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### 1. Failure to Respond

Here, plaintiff failed to submit any opposition papers to defendants' motion for partial summary judgment. Plaintiff requested an extension to file his response to the present motion twice. Dkt. Nos. 96, 98. Despite the Court granting two extensions, plaintiff has not

submitted an opposition to defendants' motion for partial summary judgment. Dkt. Nos. 97, 99. Defendants' notice of motion included a conspicuous notification of the consequences of failing to respond to a summary judgment motion. Dkt. No. 93-1. Given this notice and the Court's grant of two extensions for plaintiff to file opposition papers, it is readily apparent that plaintiff was adequately apprised of the pendency of the motion and the consequences of failing to respond.

"Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se*." Jackson v. Onondaga County, 549 F. Supp. 2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However "[a] verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (stating that a verified pleading based on personal knowledge may be considered for purposes of a summary judgment motion).

Plaintiff's complaint is adequately verified, and, therefore, will be considered in determining whether there are genuine issues of material fact. Dkt. No. 1 at 12. The facts set forth in defendants' Rule 7.1 Statement of Material Facts are accepted as true as to those facts that are not disputed in plaintiff's complaint. N.D.N.Y.L.R. 7.1 (a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert."). To the extent defendants' statements are not specifically controverted by plaintiff's complaint, the Court accepts them as true.

See Crenshaw v. Syed, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010).

## 2. Failure to File Amended Complaint

Defendants argue that certain claims in plaintiff's complaint must be dismissed "as a matter of law" because of plaintiff's failure to file an amended complaint as recommended in this Court's October 30, 2012 Report-Recommendation and Order. Dkt. No, 93-11 at 12, 17.

Fed. R. Civ. P. 41(b) allows the district court to involuntarily dismiss an action on the defendant's motion if the plaintiff fails to prosecute or comply with the federal rules or a court order. However, "the power of a district court to take such action—while explicitly sanctioned by Rule 41(b)—'has generally been considered an inherent power, governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Lewis v. Rawson, 564 F.3d 569, 575 (2d Cir. 2009) (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)) (internal quotation marks omitted) .

This Court recommended that plaintiff file an amended complaint as to: (1) the Eighth Amendment claims against Oshier; (2) the Eighth Amendment claims against Johnson; and (3) the First Amendment denial of access to the courts claims against Oshier, Miller, Dr. Maxon, Dr. Johnson, and Lecuyer. Dkt. No. 49 at 28, 30, 34. Rather than dismiss these claims under Rule 41(b), the undersigned will address these claims on the merits.

## B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994) (quoting Helling v. McKinney, 509 U.S. 25 (1993)); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)). The Eighth Amendment obligates prison officials to provide necessary medical care to prisoners. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). To state a cognizable claim against prison officials for deliberate indifference to a substantial risk of serious injury, a prisoner must first show the presence of a "serious illness or injury." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk of harm and failing to take measures to avoid the harm. Farmer, 511 U.S. at 834.

A serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Bock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511

-23-

U.S. at 837.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  <u>Gamble</u>, 429 U.S. at 104.  "[M]ere disagreement over the proper treatment does not create a constitutional claim" as long as the treatment was adequate.  <u>Chance</u>, 143 F.3d at 703.  Therefore, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a Section 1983 claim."  <u>Sonds v. St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Defendants do not dispute that plaintiff suffered from a serious medical condition as it relates to his vision.  Dkt. No. 93-11 at 9.  Further, this Court previously determined that plaintiff's arthritic pain constitutes a serious medical condition.  Dkt. No. 49 at 27.  Because these are the only conditions at issue, the undersigned will assume that the requirement of a "serious medical condition" has been met as to all of plaintiff's medical conditions at issue.  <u>See</u> <u>Smith</u>, 316 F.3d at 184.

### 1. Plaintiff's Vision Problems

#### i. Miller

Plaintiff contends that Miller was deliberately indifferent to his medical needs when she: (1) refused to allow plaintiff to wear his personal glasses or provide "accommodations" in lieu of same; (2) issued to plaintiff dark solar shield sunglasses instead of tinted, state-issued glasses; and (3) failed to provide plaintiff with a new contact lens and gradient-tinted glasses as recommended by Drs. Eden and Gigante.  Compl. at 11, 52-53.

First, DOCCS policy does not allow inmates to wear glasses that are not state-issued.  Oshier Aff. ¶ 7.  It is clear that plaintiff would have preferred to wear his own glasses while he waited for an appointment with an optometrist; however, his disagreement with Clinton's medical staff does not amount to an Eighth Amendment violation.  See Hogan v. Russ, 890 F. Supp. 146, 149 (N.D.N.Y. 1995) (finding no deliberate indifference where it was prison policy not to pay for specialized dental care where the procedure was not necessary and an alternate adequate remedy existed).  Accordingly, plaintiff cannot maintain a claim against Miller for acting in accordance with DOCCS policy.

Addressing the tinted glasses claim, on October 21, 2008, defendant Dr. Maxon, an optometrist, saw plaintiff for the first time and prescribed solar shield sunglasses to be worn over his contact lens and eyeglasses.  Maxon Decl. ¶ 15.  Miller directed Oshier to issue plaintiff tinted glasses as prescribed by Dr. Maxon.  Compl. ¶¶ 6(19), (20).  Far from being indifferent to plaintiff's needs, the record shows that Miller issued plaintiff a medically-appropriate pair of glasses after his initial visit with Dr. Maxon.  Id. ¶ 6(22).

Finally, plaintiff contends that Miller failed to heed the recommendations of Drs. Eden and Gigante when she did not provide him with new contact lenses and gradient-tinted glasses.  Compl. at 52.  As to the gradient-tinted glasses, Miller considered Dr. Gigante's recommendation and ultimately noted in plaintiff's Ambulatory Health Record ("AHR") that he had already received tinted glasses in May 2009.  Id. ¶ 6(93).  Further, Dr. Gigante's recommendation did not specify whether the tint on the recommended glasses was to be permanent or transitional.  Simpson Aff. ¶ 41.  Therefore, any decision on Miller's part to not issue new gradient-tinted glasses to plaintiff was supported by the plaintiff's AHR.  Compl. ¶

6(93).  Further, "disagreements over . . . forms of treatment . . . are not adequate grounds for a Section 1983 claim."  <u>Sonds</u>, 151 F. Supp. 2d at 312.  Here, Miller made her own medical determination that the existing tinted lenses were sufficient.  Thus, Miller's failure to clarify the recommendation does not amount to deliberate indifference.

As to the contact lenses recommended by Dr. Gigante, plaintiff does not describe in his complaint any interactions with Miller regarding new contact lenses.  He states that Miller violated his Eighth Amendment rights by not providing him with new contact lenses without setting forth any factual assertions to support that claim.  Here, Miller examined plaintiff, instructed Oshier to issue solar shield glasses, and issued multiple medical passes and prescriptions to plaintiff throughout his time at Clinton.  Compl. ¶¶ 6(22)-(24), (28), (44), (83); Simpson Aff. ¶¶ 35-36.  Plaintiff's conclusory allegation that he suffered a constitutional violation because of Miller's alleged failure to provide contact lenses is insufficient to amount to deliberate indifference to plaintiff's serious medical needs.  <u>See Wright v. Genovese</u>, 694 F. Supp. 2d 137, 156-57 (N.D.N.Y. 2010) ("Plaintiff's . . . conclusory allegations of deliberate indifference do not negate extensive evidence that [defendants] diligently addressed plaintiff's medical needs over an extended period of time.").

Based on the record, defendant Miller did not "disregard . . . [a] serious medical need[,]" <u>Chance</u>, 143 F.3d at 702, nor did she "intentionally deny[] or delay[] access to medical care or intentionally interfer[e] with the treatment . . . prescribed."  <u>Gamble</u>, 429 U.S. at 104.  As such, plaintiff has failed to show there is a genuine issue of material fact as to Miller's alleged deliberate indifference toward plaintiff's serious medical needs.

Accordingly, it is recommended that defendants' motion on this ground be granted.

## ii. Dr. Maxon

Plaintiff alleges that Dr. Maxon was deliberately indifferent to his medical needs in prohibiting him from wearing his own sunglasses. Compl. at 11. Plaintiff also alleges that Dr. Maxon was deliberately indifferent to his medical needs in failing to prescribe tinted glasses and instead prescribing dark solar shield glasses. Id.

As noted, the issue whether plaintiff would be allowed to wear his own personal glasses is governed by DOCCS policy. The DOCCS' Health Services Policy Manual ("HSPM") states that inmates cannot wear prescription glasses that are not state-issued. Oshier Aff. ¶ 7. Therefore, Dr. Maxon was following DOCCS policy when he refused to grant plaintiff permission to wear his personal sunglasses. Maxon Decl. ¶ 13. Dr. Maxon's refusal, therefore, does not amount to deliberate indifference. See Hogan, 890 F. Supp. at 149.

As to Dr. Maxon's providing plaintiff with solar shield glasses, he first examined plaintiff on October 21, 2008 and determined that he suffered from conditions sufficient to require eye protection. Maxon Decl. ¶¶ 14-15. After that visit, Dr. Maxon prescribed non-prescription dark solar shield glasses to plaintiff for use with both his contact lens and his spectacle eyeglasses. Id. ¶ 15. In response to plaintiff's complaints that he was still experiencing pain, Dr. Maxon prescribed poly-carb transitional lenses in December of 2008. Id. ¶ 19. Plaintiff continued to complain that the lenses were not dark enough, but plaintiff was examined again on March 19, 2009, and "darker lenses [were] not indicated." Simpson

Aff. Ex. A at 53.  At a May 18, 2009 visit with Dr. Maxon, testing revealed that plaintiff's prescribed glasses were correct and darker lenses were still not medically necessary. Maxon Decl. ¶ 20.

After Dr. Eden recommended that plaintiff receive gradient-tinted lenses on June 4, 2010, Dr. Maxon prescribed the recommended lenses, along with a new contact lens, despite disagreeing with Dr. Eden's diagnosis and believing transitional lenses to be sufficient.  Maxon Decl. ¶¶ 22-24.  Plaintiff was examined by Dr. Maxon at least six times during his nearly twenty-seven-month stay at Clinton.  Dkt. 93-11 at 11.  The record reveals that Dr. Maxon prescribed to plaintiff three pairs of glasses and a new contact lens during his stay.  Maxon Decl. ¶¶ 15, 19, 22-24.  Dr. Maxon made multiple attempts to find a solution to plaintiff's complaints of eye pain, despite his assessment that plaintiff did not suffer from chronic photophobia.  Id. ¶¶ 16, 18-19, 21, 23.  Plaintiff's complaint indicates that he disagreed with Dr. Maxon's course of treatment, but such disagreement does not amount to a constitutional violation because "a difference of opinion between an inmate and medical professionals, or even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference."  Williams v. M.C.C. Institution, No. 97 CIV. 5352 (LAP), 1999 WL 179604, at *7 (S.D.N.Y. March 31, 1999).

Accordingly, as plaintiff has failed to demonstrate that Maxon was deliberately indifferent to his serious medical needs, it is recommended that defendants' motion on this ground be granted.  See Hogan, 890 F. Supp. at 149.

### iii.  Oshier

Plaintiff alleges that defendant Oshier failed to (1) provide him with gradient tint glasses and a new contact lens; (2) failed to allow him to wear his own glasses; and (3) improperly issued to him dark solar shield sunglasses. Dkt. 49 at 12. He contends that such conduct amounts to deliberate indifference to his serious eye condition.

As noted, plaintiff was prohibited from wearing his personal sunglasses as per DOCCS policy. Oshier Aff. ¶ 7. Further, the record supports that Oshier was not involved in any decision regarding which glasses or contact lenses to prescribe to plaintiff, as she is not a medical professional. Id. ¶¶ 12-13. Because Oshier was following DOCCS policy when she told plaintiff to remove his personal sunglasses, and plaintiff has not set forth any facts to show that Oshier was deliberately indifferent to his medical needs, it is recommended that defendants' motion on this ground be granted.

### iv. Dr. Johnson

Plaintiff alleges that Dr. Johnson was deliberately indifferent to his medical needs because she caused a substantial delay in providing him with tinted glasses. Compl. ¶ 6(17).[6]

A delay in administering medical care does not amount to deliberate indifference where there is no evidence of a need for immediate attention. Swift v. Tweddell, 582 F. Supp. 2d 437, 445 (W.D.N.Y. 2008) (finding no deliberate indifference where plaintiff waited two months to see a psychiatrist and where "there was nothing that should reasonably have

---

[6] Plaintiff was ordered to amend his complaint to add specific allegations regarding Dr. Johnson's personal involvement in the denial of his tinted glasses and contact lenses. Dkt. 49 at 29-30. Plaintiff failed to file an amended complaint. See section III.A.i supra.

indicated to defendants that plaintiff had a particularly urgent need for care"). Although in some cases, a delay in medical care can suggest deliberate indifference, "a prisoner's Eighth Amendment rights are violated only where the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain. . ." Rodriguez v. Ames, 224 F. Supp. 2d 555, 561 (W.D.N.Y. 2002).

On October 20, 2008, plaintiff wrote a letter to Dr. Johnson stating that he had been deprived of tinted glasses and was suffering injury from that deprivation. Compl. ¶ 6(17). However, following examination, Dr. Maxon prescribed solar shield glasses to plaintiff on October 21, 2008, only one day after his complaint to Dr. Johnson. Maxon Decl. ¶ 14. As explained, Dr. Maxon provided plaintiff with another pair of glasses in December of 2008. Id. ¶ 19. When plaintiff inquired as to when he would be receiving his new contact lens and glasses per Dr. Eden and Dr. Gigante's recommendations, Dr. Johnson responded to plaintiff by letter, explaining that the recommendations would be addressed at his next optometrist visit. Simpson Aff. ¶ 53. Dr. Maxon did address those recommendations with plaintiff at his subsequent visit. Id. ¶ 55; Simpson Aff. Ex. A at 105. Although plaintiff waited just under three months between his appointment with Dr. Eden, where he recommended permanent-tinted glasses and contact lenses, and his appointment with Dr. Maxon, plaintiff has set forth no evidence to suggest that Dr. Johnson was aware of a serious risk of harm to the plaintiff arising out of this delay. See Swift, 582 F. Supp. 2d at 445. Plaintiff had access to solar shield glasses, as well as the poly-carb transitional lenses provided in December 2008. Thus, there is evidence supporting that he had sufficient eye care while he awaited the new lens and glasses. Further, there is no evidence that the

three month period was an intentional delay.

Accordingly, as plaintiff has set forth no facts to show that Johnson was deliberately indifferent to his medical needs, it is recommended that defendants' motion for summary judgment on this ground be granted.

### v. Lecuyer

Plaintiff contends that Lecuyer was deliberately indifference to his eye condition when he failed to provide him with tinted glasses. Compl. ¶ 6(94). He also claims that he made Lecuyer aware of his medical issues and his need for "reasonable accommodations." Id. ¶ 6(120). Plaintiff provides no explanation of how Lecuyer was responsible for issuing glasses or any evidence of Lecuyer being aware of a serious risk to plaintiff's health. To the contrary, plaintiff's AHR contains copies of permits approved by Lecuyer that (1) allowed plaintiff to wear transitional lenses, dated February 27, 2009; (2) allowed plaintiff to wear transitional lenses, dated July 19, 2010; and (3) allowed plaintiff to wear solar shield glasses, dated July 19, 2010. Simpson Aff .Ex. A at 36, 98, 100. These permits show that Lecuyer helped, not hindered, plaintiff in obtaining sufficient eye care. The statements in plaintiff's complaint are self-serving allegations that are insufficient to preclude summary judgment. Davidson v. Desai, 817 F. Supp. 2d 166, 195 (W.D.N.Y. 2011) (granting summary judgment on claim that defendants lost or ignored a specific inmate grievance on the ground that plaintiff provided no evidence other than a conclusory claim that the violation had occurred).

Accordingly, there is no genuine issue of material fact as to Lecuyer's alleged violation of plaintiff's Eighth Amendment rights, and it is recommended that defendants'

motion on this ground be granted.

### vi. LaValley

Plaintiff alleges that LaValley was deliberately indifferent to his eye condition because he (1) did not permit plaintiff to wear his personal glasses; (2) issued solar shield sunglasses to plaintiff; and (3) did not provide tinted state-issued glasses.  Compl. at 11.

On November 25, 2008, plaintiff asked LaValley if he could wear his own glasses instead of the solar shield glasses prescribed by Dr. Maxon.  Id.  ¶¶ 6(47)-(49).  He also told LaValley that he was experiencing difficulty ambulating while wearing the solar shield glasses because he could not see properly with them on.  Id. ¶ 6(48).  Plaintiff alleges that LaValley refused to let him wear his own personal glasses.  Id. ¶ 6(49).  Plaintiff asserts that LaValley's refusal to allow him to wear his own glasses amounts to deliberate indifference to his serious vision problems.  Id. at 11.

Plaintiff does not plead any facts to indicate that LaValley was involved in the decisions to (1) issue solar shield sunglasses or, (2) provide state-issued glasses.  The record shows that plaintiff was prevented from wearing his personal sunglasses upon his arrival at Clinton due to DOCCS policy.  Oshier Aff. ¶ 7.  As stated, prison officials may rely on prison policy in denying an inmate's requested medical care where the particular care requested is not necessary.  See Hogan, 890 F. Supp. at 149.

Plaintiff also alleges that he made LaValley aware that he was experiencing difficulty ambulating while wearing the solar shield glasses, and LaValley did nothing to investigate plaintiff's claim.  However, the day before plaintiff allegedly spoke to LaValley regarding his difficulties with the solar shield glasses, Oshier had issued a memorandum to LaValley

explaining the events that led to plaintiff's receiving the solar shield glasses and informing

him that plaintiff was scheduled for an appointment with an optometrist for evaluation for

"safety frame eyeglasses."  Simpson Aff. Ex. A at 22.  When LaValley met with plaintiff the

day after receiving the memorandum from Oshier, he told plaintiff that he was "well aware"

of plaintiff's situation.  Compl. ¶ 6(50).  Prison officials are entitled to rely on the opinion of

medical professionals regarding the treatment of inmates' medical conditions.  <u>Joyner v.

Greiner</u>, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002).  Further, Dr. Maxon opined that the

solar shield glasses given to plaintiff on October 21, 2008 were sufficient to meet his eye

care needs.  Maxon Decl. ¶ 17.  Given that LaValley was aware that plaintiff had an

upcoming visit with Dr. Maxon, and Dr. Maxon believed the solar shield glasses were

sufficient to meet plaintiff's needs, plaintiff has failed to show that LaValley was deliberately

indifferent to his serious medical needs.  <u>See</u> <u>Gamble</u>, 429 U.S. at 104.

Accordingly, it is recommended that defendants' motion on this ground be granted.


### vii.  Artus

Plaintiff alleges that defendant Artus violated his Eighth Amendment rights where he

failed to respond to plaintiff's two letters complaining of inadequate medical treatment.

Compl. ¶¶ 6(12), (40).

An allegation that a prisoner sent a letter to a prison superintendent, without more, is

insufficient to raise a triable issue of fact as to whether a prison official was personally

involved in a constitutional violation.  <u>Colon</u>, 58 F.3d at 873.  Referring a prisoner complaint

to a subordinate, without more, is also insufficient to raise a triable issue of fact whether a

prison official was personally involved in a constitutional violation.  <u>Vega v. Artus</u>, 610 F.

Supp. 2d 185, 199 (N.D.N.Y. 2009) (holding that a superintendent's referring letters to subordinate staff for investigation did not amount to personal involvement).

Plaintiff first sent a letter to Artus on October 10, 2008, "complaining about the actions" of defendants Blaise, Oshier, and Ezero.  Compl. ¶ 6(12).  According to plaintiff's complaint, Artus referred the letter to LaValley.  Id.  Plaintiff sent a second letter to Artus some time after his November 7, 2008 appointment with Dr. Maxon.  Id. ¶ 6(40).  He does not specify the date he sent the letter or the letter's content, but does state that he appended a copy of the grievance he filed against Dr. Maxon and Oshier.  Id.  As stated previously, plaintiff's allegation that he sent a letter to Artus is insufficient to raise a triable issue of fact as to Artus' personal involvement in the alleged constitutional violations of Blaise, Oshier, Ezero, and Dr. Maxon.  Colon, 58 F.3d at 873.

Plaintiff also alleges that he made Artus "aware of his medical problems and reasonable accommodations requests" during multiple face-to-face conversations.  Compl. ¶ 6(120).  To prove his claim of supervisory liability, plaintiff must show "that a prison official knew that the inmate faced a substantial risk of serious harm but nevertheless disregarded that risk by failing to take reasonable measures to abate it."  Burnell v. Mann, No. 92-CV-744, 1994 WL 719222, at *2 (N.D.N.Y. Dec. 27, 1994).  However, where there is no underlying constitutional violation committed by subordinates, a supervisor cannot be held liable.  See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003).  "To maintain [a claim against a supervisor] . . . an inmate must adequately 'allege that the official had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act.'"  Alston v. Bendheim, 672 F. Supp. 2d 378, 389-90 (S.D.N.Y. 2009) (quoting Ifill v. Goord, No. 03-CV-355S, 2005 WL 2126403, at *4 (W.D.N.Y.

-34-

Sept. 1, 2005)).

The only constitutional violation that plaintiff has raised an issue of material fact is defendant Jennette's refusal to honor his feed-in-cell pass.  <u>See</u> section III.B.2.i <u>infra</u>. However, plaintiff has produced no evidence to show that Artus was aware of Jennette's actions and failed to act on them.  <u>See</u> <u>Hernandez</u>, 341 F.3d at 145.  As to his contacts with Artus regarding other defendants, plaintiff claims that he spoke with him about defendants Blaise, Oshier, Ezero, and Dr. Maxon, but not Jennette and that he had other conversations with him about "his medical problems and reasonable accommodations requests."  <u>See</u> Compl. ¶¶ 12, 120.  Plaintiff's complaints to Artus about Blaise, Oshier, and Ezero were referred to LaValley, and his complaints to Artus regarding Dr. Maxon and Oshier were already the basis of a formal grievance filed by plaintiff, evidenced by plaintiff's own letter. <u>See</u> Compl. ¶¶ 6(12), (40).  Based on these facts, the record shows that plaintiff's complaints were appropriately handled.  Plaintiff does not allege any facts by which a finder of fact could find that Artus acted deliberately indifferent to his serious medical needs.  <u>See</u> <u>Hernandez</u>, 341 F.3d at 145 (holding that no jury could infer deliberate indifference by a supervisor where there were no underlying constitutional violations).  Although the undersigned has determined that plaintiff has alleged facts sufficient to survive summary judgment based on his claim that Jennette interfered with his feed-in-cell pass, plaintiff has not shown that Artus was grossly negligent in supervising Jennette or that his failure to act on plaintiff's complaints amounted to deliberate indifference.  <u>See</u> <u>Alston</u>, 672 F. Supp. 2d at 389-90.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### viii.  Ezero

Plaintiff claims that Ezero violated the Eighth Amendment by threatening him and telling him not to wear his glasses.  Compl. ¶ 6(10).  He also claims that Ezero intended to assault him.[7]  Id. ¶ 6(11).

Plaintiff does not allege that Ezero physically removed his glasses from his person nor does he allege any specific facts to indicate that Ezero deprived him of his glasses or exposed him to a serious risk of harm.  Plaintiff's sole allegation that Ezero told plaintiff that he "better not see or catch [him] wearing" the glasses, Compl. ¶ 6(10), is insufficient to defeat a summary judgment motion because "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983."  Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (internal quotation marks omitted) (citations omitted).

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2. Interference with Feed-in-Cell Permits, Medical Delivery of Prescription Medication, and Medical Showers

### i.  Jennette

Plaintiff claims that defendant Jennette, a corrections officer, was deliberately indifferent to his eye condition and his arthritic pain when he: (1) refused to honor plaintiff's

---

[7]  The Court previously recommended dismissal of plaintiff's Eighth Amendment claims based on Ezero's threats and harassment.  Dkt. No. 49 at 4.  Judge D'Agostino adopted this recommendation in her Memorandum-Decision and Order.  Dkt. No. 52 at 20.

feed-in-cell pass issued by Miller on October 21, 2008; (2) refused to honor plaintiff's feed-in-cell pass issued by Blaise on November 20, 2008; and (3) interfered with the delivery of medication to plaintiff's cell. Compl. at 53-54; ¶¶ 6(24), (41), (44)-(45).

Plaintiff alleges that Jennette interfered with his medical pass allowing medications to be delivered to his cell. However, plaintiff fails to allege how Jennette interfered with the medicine delivery or any details of the alleged interference. Plaintiff states that, on November 26, 2008, he inquired of defendant Miller why his evening medication delivery had been terminated, and she stated that "Jennett [sic] had her rescind his feed-in-cell so now the plaintiff can go to the mess hall and his door-to-door service expired." Compl. ¶¶ 6(51)-(52). "[I]n order to be sufficient to create a factual issue for purposes of a summary judgment motion, [an affidavit] must . . . not be conclusory." Burns v. Trombly, 624 F. Supp. 2d 185, 191 (N.D.N.Y. 2008). Plaintiff has not pleaded facts sufficient to defeat defendants' summary judgment motion regarding Jennette's alleged interference with the delivery of medication to his cell.

As to Jennette's two refusals to honor plaintiff's feed-in-cell pass, defendants argue that plaintiff missed meals because of "his unjustified refusal to accept the food offered to him in the mess hall[.]" Dkt. No. 93-11 at 15. However, plaintiff received valid feed-in-cell passes on October 21, 2008 and November 20, 2008, and defendants do not dispute that plaintiff was issued those passes. Compl. ¶¶ 6(24), (44). Jennette refused to honor either of those passes even though they appear to have been in effect at the time of Jennette's refusal. Id. 6(41)-(42), (45). Plaintiff's claim of Jennette's interference with medically-prescribed treatment creates a genuine issue of material fact as to whether he acted deliberately indifferent to plaintiff's serious medical need. See Hernandez v. Keane, No. 97

CIV. 1267 BSJ, 2000 WL 16951, *4 (S.D.N.Y. Jan. 7, 2000) (denying summary judgment where plaintiff pleaded interference with medically-prescribed shower passes, even in the absence of a serious injury).

Accordingly, it is recommended that defendants' motion on this ground be granted as to Jennette's alleged interference with the delivery of medication to plaintiff's cell, and denied as to Jennette's alleged interference with plaintiff's feed-in-cell passes.

### ii. LaValley

Plaintiff claims that LaValley was deliberately indifferent to his eye condition and arthritic pain when he failed to investigate Jennette's alleged interference with plaintiff's feed-in-cell pass. Compl. ¶ 6(50).

Plaintiff spoke with LaValley on November 25, 2008 regarding his glasses and his difficulty in traveling around the prison. Compl. ¶ 6(49). At that time, plaintiff claims that LaValley "indicated" that Jennette had rescinded his feed-in-cell pass. Id. at ¶ 6(50). However, on the same day that plaintiff spoke to LaValley, plaintiff received a memorandum from the medical staff at Clinton advising him that he had no medical restrictions preventing him from going to the mess hall for meals. Simpson Aff. ¶ 24.

Prison officials are entitled to rely on the opinion of medical professionals concerning the proper course of treatment. Benitez v. Parmer, No. 9:12-CV-0448 (GTS/DEP), 2013 WL 5310245, at *6 (N.D.N.Y. Jul 8, 2013) (citing Mercer v. Benson, No. 08-CV-0537 (DNH/DRH), 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009). Therefore, insofar as plaintiff's complaint alleges that LaValley interfered with his feed-in-cell pass, the record provides that plaintiff was determined by medical staff to be ineligible for a feed-in-cell pass

-38-

at the time that he spoke to LaValley.  Simpson Aff. ¶ 24.  Plaintiff's AHR clearly indicates that the medical professionals at Clinton had deemed him able to travel to the mess hall for meals at the time that he spoke with LaValley.  Id.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### iii.  Oshier

Plaintiff alleges that Oshier interfered with (1) his feed-in-cell pass, subjecting him to an involuntary hunger strike; and (2) his medical permit to receive medications in his cell.  Compl. at 53.

When an inmate claims that non-medical prison personnel acted deliberately indifferent to his serious medical need, he must show that they "'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.'" Jones v. Rock, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *23 (N.D.N.Y. Sept. 6, 2013) (quoting Hoover v. Hardman, No. 9:99-CV-1855, 2005 WL 1949890, at *4 (N.D.N.Y. Aug. 15, 2005).  Plaintiff has not provided specific allegations of how Oshier interfered with his passes.  Further, plaintiff has not shown that Oshier was aware that he was in extreme pain or suffering from a medical problem.  See Jones, 2013 WL 4804500, at *23.  "[I]n order to be sufficient to create a factual issue for purposes of a summary judgment motion, [an affidavit] must . . . not be conclusory." Burns, 624 F. Supp. 2d at 191.  Oshier stated, in her sworn affidavit, that she is not a medical professional, and, because she is not a medical professional, was not involved in any decisions to issue medical passes to plaintiff.  Oshier Aff. ¶ 14.  Thus plaintiff has failed to raise a question of fact as to whether Oshier intentionally delayed him

-39-

access to medical care in violation of the Eighth Amendment.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### iv.  Badger, Miller and Johnson

Plaintiff sets forth multiple claims against Badger, Miller, and Dr. Johnson alleging that: (1) Badger and Miller interfered with the use of his medical feed-in-cell permit; (2) Badger, Miller, and Dr. Johnson interfered with his medication delivery; and (3) Miller and Dr. Johnson interfered with the use of his medical shower permit.  Compl. at 53-54.

### a.  Feed-in-Cell Pass

Plaintiff has failed to allege any facts to show that Badger or Miller interfered with his feed-in-cell permit.  The record shows that the first feed-in-cell permit issued to plaintiff when he first arrived at Clinton expired on or about November 25, 2008, when he was issued a memorandum informing him that he had no medical restrictions that prevented him from going to the mess hall for meals.  Simpson Aff. ¶ 24.  After plaintiff was diagnosed with a worsening cataract in June 2010, defendant Dr. Johnson issued plaintiff a feed-in-cell permit on July 19, 2010.  Id. ¶ 52.  Nothing in plaintiff's complaint indicates that Miller or Badger interfered with his obtaining or using of a feed-in-cell permit.  Further, plaintiff makes no claim that he was prevented from traveling to the mess hall for meals or otherwise denied access to food.  To the extent that plaintiff's complaint may be read to argue that a feed-in-cell permit should have been issued to him, such an argument cannot stand because disagreements between an inmate and a prison's medical personnel do not

amount to a constitutional violation.  Williams, 1999 WL 179604 at *7.

### b. Medication Delivery

Plaintiff argues that Miller, Badger, and Dr. Johnson interfered with the delivery of medication to his cell.  Compl. 54.  However, plaintiff twice completed forms refusing the delivery of medicine to his cell.  Simpson Aff. ¶¶ 17, 34.  There are ample records indicating plaintiff's multitude of visits with the medical staff at Clinton.  Notably, plaintiff's AHR contains multiple notes indicating that plaintiff was seen by medical staff at appointments where his prescription regimen was discussed or addressed.  Simpson Aff. ¶¶ 14, 19, 35-36, 44, 54, 58, 65, 69.  Moreover, plaintiff was seen by medical staff on November 26, 2008, the same day he claims that Badger unlawfully discontinued delivery of his prescription to his cell.  Simpson Aff. Ex. A at 23.  He was prescribed Tylenol by defendant Miller at that appointment.  Id.  Additionally, plaintiff was seen by Miller the day after he submitted his refusal form on April 30, 2009.  Id. at 52.  At that appointment, Miller acknowledged the refusal form, discontinued plaintiff's Tylenol prescription, and prescribed Diclofenac and Misoprostol instead.  Id.  Further, plaintiff cites no identifiable injury from the alleged deprivation of his prescription delivery, except for pain for which he continuously received treatment.  See Smith v. Carpenter, 316 F.3d 178, 188 (2d Cir. 2003) (finding that the absence of an identifiable injury suggests that plaintiff was not exposed to an unreasonable risk of harm).  As plaintiff received continuous medical treatment related to his medication regimen, and refused his medication delivery on multiple occasions, no reasonable juror could find that Miller, Badger, or Dr. Johnson deliberately interfered with plaintiff's medication delivery.  Plaintiff's disagreement with Clinton's medical staff over

whether his prescribed medication should have been delivered to his cell amounts to a disagreement over a form of treatment. <u>Felix-Torres v. Graham</u>, 687 F. Supp. 2d 38, 63 (N.D.N.Y. 2009) (citing <u>Chance</u>, 143 F.3d at 703) (holding that a disagreement over a form of treatment is insufficient to raise a constitutional claim as long as the treatment was adequate); <u>see also</u> <u>Wright</u>, 694 F. Supp. 2d at 155 (citing <u>Sonds</u>, 151 F. Supp. 2d at 311). Thus, as plaintiff failed to provide any detail supporting his claims that Badger, Miller, and Dr. Johnson interfered with his medical delivery and provided no evidence that he was otherwise denied access to his medication, plaintiff has not demonstrated a constitutional violation.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### c. Medical Shower Permit

As to the third claim against Miller and Dr. Johnson, plaintiff has pled no facts to show that he was issued a medical pass for showers. Therefore, he has not shown that Miller or Dr. Johnson interfered with such a pass. Plaintiff bases his necessity for the pass only on his experience as an inmate at Clinton thirty years prior to his arrival at Clinton in October 2008, and speculations that the shower conditions have not improved since then. Dkt. No. 93-4 at 160-61. Plaintiff testified in his deposition that he was able to travel to the gym about once per week and there were showers available there. <u>Id.</u> at 166. Further, the medical staff at Clinton never received any complaints regarding issues with plaintiff's personal hygiene. Simpson Aff. ¶ 68. To the extent that plaintiff argues that a medical pass for showers should have been issued to him, such an argument is no more than a disagreement between plaintiff and medical personnel. <u>Williams</u>, 1999 WL 179604 at *7;

-42-

see also Cole v. Levitt, No. 07-CV-00767(M), 2009 WL 4571828, at *9 (W.D.N.Y. Dec. 4, 2009) ("'Deliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention he desired.'") (quoting Shire v. Greiner, No. 02 Civ. 6061(GBD), 2007 WL 840472, at *12 (S.D.N.Y. Mar. 15, 2007)).  Plaintiff's admission that he was able to travel to the gym once per week also indicates that any failure to provide a shower pass did not expose him to a substantial risk of harm.  Plaintiff cannot argue that he has suffered a constitutional violation simply because he apparently asked for a permit and did not receive one.

Accordingly, it is recommended that defendants motion on this ground be granted.


### v.  Patnode

Plaintiff alleges that defendant Patnode violated his Eighth Amendment rights by (1) interfering with plaintiff's requests for accommodations for his visual impairments; (2) denying plaintiff medical showers; (3) denying plaintiff feed-in-cell status; and (4) receiving and responding to a grievance filed by plaintiff against himself.  Dkt. No. 51.[8]

Defendants argue that Patnode must be dismissed from the action because the Court has already held that there is no individual liability under the ADA and the RA.[9]  Dkt. No. 93-11 at 23. Defendants are correct in that assessment, see Herzog v. McLane Northwest, Inc., 999 F. Supp. 274, 276 (N.D.N.Y. 1998) (citing cases); see also Henrietta D.

---

[8]  District Judge D'Agostino's Memorandum-Decision and Order denied defendants' motion to dismiss based on Patnode's lack of personal involvement and allowed plaintiff's claims of Patnode's constitutional violations to move forward.  Dkt. No. 52 at 17-18.

[9]  See Dkt. No. 52 at 18-19.

v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003 (finding that the same standards and analysis are used for an ADA claim and a claim under the Rehabilitation Act), however, they fail to address the alleged Eighth Amendment constitutional violations committed by Patnode that survived defendants' motion to dismiss.  Because defendants have not requested summary judgment on the alleged constitutional violations committed by defendant Patnode, the Court will not address the sufficiency of these claims.

Accordingly, it is recommended that defendants' motion on this ground be denied.


### 3.  Plaintiff's Prescription Medications

### i.  Lee, Miller and Dr. Johnson

Plaintiff claims that defendants Lee, Miller, and Dr. Johnson violated his Eighth Amendment rights by denying him "recommended pain relief medication."  Compl. at 56.

Plaintiff's AHR indicates that his prescription medication regimen was addressed numerous times throughout his time at Clinton.  Simpson Aff. ¶ 63; Simpson Aff. Exhibit A at 3-5, 65, 104, 122, 127-38.  He received pain medications that are commonly prescribed to inmates with similar complaints.  Simpson Aff. ¶ 63.  When plaintiff sent a letter to Dr. Johnson complaining that defendant, Dr. Kang Maeng Lee, was not providing him with adequate pain medication, Dr. Johnson responded that the medications plaintiff received were appropriate for treating plaintiff's symptoms.  Id. ¶ 65.  Therefore, plaintiff has not pled sufficient facts to show that Dr. Lee and Dr. Johnson were deliberately indifferent to his serious medical needs.  See Cole, 2009 WL 4571828, at *9 (finding no evidence of deliberate indifference where the plaintiff did not receive the treatment he desired).

Plaintiff also complains that non-party Dragos Macelaru, an orthopedist, recommended cortisone injections, and defendant Miller, a nurse, "disregarded" the recommendation. Compl. ¶ 6(91). However, as stated, disagreements among medical professionals over a course of treatment do not amount to deliberate indifference. Sonds, 151 F. Supp. 2d at 312; Hernandez v. New York State Dep't of Corr., No. 97-CV-1267 (SC), 2000 WL 34239139, at *7 (S.D.N.Y. Nov. 28, 2000) (holding that a failure to follow up on therapy recommendations only shows that the defendant did not administer the treatment that the plaintiff preferred). Further, plaintiff's AHR record from his first visit with Dr. Macelaru on August 28, 2009 states that cortisone was "unavailable" at that time, and that he should see plaintiff for a follow-up visit when cortisone becomes available. Simpson Aff. Ex. A at 61. Plaintiff has not presented any facts to show that Miller's inaction amounted to deliberate indifference. To the extent that plaintiff claims he should have been prescribed stronger pain management medication, such a claim does not amount to a constitutional violation. Veloz v. New York, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (holding that a plaintiff's disagreement with medical personnel regarding prescribing him a pain medication stronger than Tylenol did not amount to a constitutional violation).

Accordingly, it is recommended that defendants' motion on this ground be granted.


### 4. Admission to the Mental Health Observation Ward

Plaintiff claims that LaValley and Artus violated his Eighth Amendment right by authorizing an "unconstitutional admission" into the Mental Health Observation Ward. Compl. at 56. Defendants argue that these claims are not supported by the allegations in plaintiff's complaint. Dkt. No. 93-11 at 25.

Plaintiff has failed to allege that Artus and LaValley were present when plaintiff was taken to the Mental Health Observation Ward on December 12, 2008. Compl. ¶¶ 6(66)-6(80). Indeed, defendants argue that because plaintiff's complaint does not allege facts as to when, why, or how Artus and LaValley authorized his admission to the Mental Health Observation Ward, his claims against them should be dismissed. Dkt. No. 93-11 at 25. Although not stated clearly in their brief, it appears that defendants are contending that Artus and LaValley were not personally involved in plaintiff's placement in the Mental Health Observation Ward.

The personal involvement of defendants in an alleged constitutional violation is a prerequisite to an award of damages under section 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Nunez v. Goord, 172 F. Supp. 2d 417, 434 (S.D.N.Y. 2001). Personal involvement can be proven by evidence that the defendant:

> (1) participated directly in the alleged constitutional violation, (2) was informed of the violation and failed to remedy the wrong, (3) created, or permitted continuation of, a policy or custom under which unconstitutional practices occurred, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring.

Id. Plaintiff has not set forth any evidence that Artus or LaValley knew or should have known (1) that plaintiff would be admitted to the Mental Health Observation Ward on December 12, 2008, or (2) that he would be subjected to excessive force by the corrections officers escorting him there.

Accordingly, it is recommended that defendants' motion on this ground be granted.

-46-

## C. First Amendment

### 1. Retaliation Claims

Plaintiff alleges that defendants Oshier, Miller, Dr. Maxon, Dr. Johnson, and Lecuyer failed to provide him with a new contact lens, as recommended by specialists Dr. Gigante and Dr. Eden and also failed to provide gradient-tinted glasses, as later recommended by the specialists. Compl. at 52. He claims that these failures were deliberately perpetrated by the defendants in retaliation for plaintiff's filing grievances against them. Id.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, NA, 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz v. Sorema, NA, 534 U.S. 506 (2002)). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the

adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." See Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In order to prove an adverse action, plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.'" Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).

### i. Miller, Dr. Maxon, Dr. Johnson, and Lecuyer

Here, plaintiff satisfies the first prong of the test by showing that his speech was protected. In his complaint, he refers to three grievances and four letters that he sent to prison officials between the time he arrived at Clinton on October 8, 2008, and September 14, 2009, the date he claims to have suffered an adverse action. Compl. ¶¶ 6(12), (17), (40), (54)-(55). It is well settled that filing of grievances constitutes protected speech. Davis, 320 F.3d at 352-53. However, plaintiff falls short of meeting the second and third prongs. Plaintiff claims that the adverse action he suffered was the denial of contact lenses and gradient-tinted glasses. Compl. at 52. Plaintiff's complaint indicates that Clinton medical personnel's failure to provide him with new contact lenses was the adverse action he suffered in retaliation for his filing of grievances. Id. However, it is apparent that Dr.

Maxon, the optometrist responsible for prescribing glasses or contact lenses for plaintiff, disagreed with the specialists' recommendations. Maxon Decl. ¶¶ 10, 23. There is no evidence that Dr. Maxon's treatment of plaintiff "was based on retaliatory or discriminatory motives, as opposed to an exercise of his medical judgment." Watson v. Wright, No. 9:08-CV-62 (NAM/ATB), 2011 WL 4527789, at *10 (N.D.N.Y. Aug. 4, 2011). In fact, Dr. Maxon ultimately prescribed both a new contact lens and gradient-tinted glasses as recommended by Dr. Eden, but did so to appease plaintiff's subjective complaints, and not because he felt it medically necessary. Maxon Decl. ¶¶ 23-24. Insofar as plaintiff argues that defendants intentionally delayed the delivery of a new contact lens and gradient-tinted glasses, he has provided no proof of any deliberate action of any defendant that suggests such a conclusion. As such, defendants have demonstrated that the treatment decisions regarding plaintiff's glasses and contact lenses would have been made regardless of any retaliatory intent. See Mount Healthy, 429 U.S. at 287.

To the extent plaintiff suggests that Miller, Dr. Johnson, and Lecuyer intentionally failed to provide plaintiff with glasses or contact lenses, plaintiff presents no evidence that these defendants were involved in prescribing or obtaining glasses or contact lenses for plaintiff. To the contrary, Dr. Maxon stated in his declaration that he was responsible for "providing [inmates] with appropriate [eye] treatment, including prescribing proper glasses and contact lenses to inmates that required corrective eyewear." Maxon Decl. ¶ 10. As to Oshier, the record supports that she was not involved in any treatment decisions regarding plaintiff's vision needs. Oshier Aff. ¶¶ 12-13 (stating she was not involved in any medical treatment decisions regarding plaintiff because she was not a medical professional).

## ii. Artus and LaValley

Plaintiff also alleges a First Amendment claim of retaliation against Artus and LaValley based on the assumption that they authorized his admittance to the Mental Health Observation Ward as retaliation for the grievances filed by plaintiff. Compl. at 56. He does not specify the specific grievance or grievances that triggered the alleged retaliation. It has already been established that plaintiff engaged in protected speech when he filed grievances. However, he has failed to prove that defendants Artus and LaValley "took adverse action against the plaintiff" because he has stated no facts that indicate that Artus or LaValley were involved in his transfer to the Mental Health Observation Ward. Espinal, 554 F. 3d at 227. The only evidence plaintiff submits to show that Artus and LaValley authorized his admission to the Mental Health Observation Ward, besides his own speculation, is the temporal proximity between when he filed a grievance against them on December 2, 2008, and the alleged assault during his admission to the Mental Health Observation Ward on December 12, 2008. Compl. ¶¶ 6(55), (66)-(79). He does not present any other direct evidence of a conspiracy to commit him to the Mental Health Observation Ward or to use excessive force in retaliation for the grievance he filed. See Nunez, 172 F. Supp. 2d at 431 (dismissing First Amendment retaliation claims against prison officials where the plaintiff showed only a temporal proximity between his successful appeal and an alleged beating). The only evidence plaintiff offers which could potentially support the finding of a nexus between his protected activity alleged and the subsequent placement in the Mental Health Observation Ward is the proximity of the alleged grievance to the alleged adverse action. The temporal proximity between the protected activity and adverse action can sometimes suffice to defeat a motion for summary judgment seeking

dismissal of a retaliation claim.  See, e.g., Colon, 58 F.3d at 872 (citation omitted).  In many circumstances, however, the temporal proximity alone is insufficient to defeat summary judgment.  See Nunez, 172 F. Supp. 2d at 431; Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000).  Here, plaintiff provides no connection between the protected conduct alleged in his complaint and his placement in the Mental Health Observation Ward.  He also provides no evidence detailing the grievances allegedly filed against Artus and LaValley. The temporal proximity, on these facts, is insufficient to survive summary judgment.  Ayers v. Stewart, No. 96-2013, 1996 WL 346049, at *2 (2d Cir. June 25, 1996) (holding that the plaintiff's "reliance on circumstantial evidence of retaliation—namely, the proximity of the disciplinary action to his complaint . . . does not suffice to defeat summary judgment.").

Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's First Amendment claims of retaliation be granted.

## 2.  Denial of Access to the Courts

Plaintiff's complaint states that because defendants Oshier, Miller, Dr. Maxon, Dr. Johnson, and Lecuyer did not provide plaintiff with gradient-tinted glasses and a new contact lens, as recommended by Drs. Gigante and Eden, two lawsuits he commenced were dismissed.  Compl. at 53.[10]

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts.

---

[10]  This Court previously recommended that plaintiff file an amended complaint and identify the facts surrounding his alleged inability to raise an argument or claim in dismissed lawsuits, the reason behind the denial of accommodations that would have allowed him to respond in the identified lawsuits, and his actual injuries.  Dkt. No. 49 at 34. Plaintiff has failed to file an amended complaint in those regards.  See section III.A.1. supra.

Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of *access to the courts*."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e. [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." Davis, 320 F.3d at 351 (internal quotation marks omitted).

Plaintiff has failed to raise a genuine issue of material fact as to his denial of access claims. First, plaintiff must prove that the defendants acted deliberately and maliciously. Davis, 320 F.3d at 351. As discussed above, plaintiff has failed to prove that the defendants acted deliberately in failing to provide him with gradient-tinted lenses and a new contact lens. Id. Second, even assuming, arguendo, that plaintiff had demonstrated a material issue of fact as to whether defendants acted deliberately and maliciously in failing to provide him with gradient-tinted glasses and a new contact lens, he has failed to show that he suffered an actual injury caused by the defendants. Id. Plaintiff claims that two lawsuits were "dismissed" in 2011 as a result of defendants' conduct. Compl. at 53. However, the docket for the first case, Cabassa v. Smith, 9:06-CV-852, reveals that plaintiff

filed opposition papers to both summary judgment motions filed by the defendants. Cabassa v. Smith, 9:08-CV-852, Dkt. Nos. 49, 60. Each opposition was filed during plaintiff's stay at Clinton. See id. The case eventually settled in May 2014. Id. Dkt. No. 107. Thus, plaintiff was clearly able to proceed in his litigation of that case, despite his claims otherwise. Any unfavorable result was not caused by defendants alleged failure to provide a contact lens or glasses, but was a dismissal due to voluntary settlement.

In the second case named by plaintiff, Cabassa v. Smith, 9:08-CV-480, the matter was dismissed after the defendants' motion for summary judgment was granted in its entirety. Cabassa v. Smith, 9:08-CV-480, Dkt. No. 60. Plaintiff received multiple extensions to file opposition papers to defendants' summary judgment motion in this case and failed to do so. Id. Dkt. No. 48, 52, 54. Defendants filed their motion to dismiss on March 12, 2010. Id. Dkt. No. 48. Plaintiff's final deadline for filing opposition papers terminated on January 31, 2011. Id. Dkt. No. 54.[11] Plaintiff filed objections to Magistrate Judge Peebles' Report-Recommendation, which recommended dismissal of plaintiff's complaint, on March 10, 2011. Id. Dkt. No. 57, 58. Despite plaintiff's objections, District Judge Kahn approved and adopted the Report-Recommendation in its entirety. Id. Dkt. No. 59. Plaintiff has failed to show that defendants were responsible for actions that hindered his efforts to pursue a legal claim. He was able to request several extensions to answer the motion and file objections to the Report-Recommendation, demonstrating that defendants' alleged conduct did not prevent him from litigating in these actions, and was not the cause of its dismissal. See

---

[11] In deference to plaintiff's pro se status and vision impairments, plaintiff's deadline for filing opposition papers to defendants' summary judgment motion was extended twice. Id. Dkt. No. 57 at 11. In total, plaintiff received an extension of ten months from the original deadline to oppose defendants' motion.

<u>Davis</u>, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

Accordingly, it is recommended that defendants' motion on this ground be granted.

### D.  ADA and RA Claims

Plaintiff claims that defendant DOCCS violated his rights under the ADA and RA by denying him a transfer to a sensorially-disabled facility and by "disregarding the unsafe and hazardous conditions" at Clinton.  Compl. at 52.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

<u>Byng v. Campbell</u>, No. 9:07-CV-471(GLS/DRH), 2010 WL 681374, at *17 (quoting <u>Clarkson v. Coughlin</u>, 898 F.Supp. 1019, 1037 (S.D.N.Y. 1995)); 42 U.S.C. § 12132.  Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, . . . [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability . . . ." 29 U.S.C. § 794(a); <u>see</u> <u>also</u> <u>Clarkson</u>, 898 F.Supp. at 1037-38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").  Because plaintiff's claims under both the ADA and the RA arise out of the same facts and circumstances, the Court

-54-

will address them together.

As to the first prong, the Report-Recommendation and Order issued previously by this Court determined that plaintiff is a qualified individual with a disability under the ADA due to his vision impairments and arthritic pain. Dkt. No. 49 at 38. Turning to the second prong, plaintiff alleged that he was denied a transfer to a sensorially-disabled facility and denied medical passes, which both constitute a denial of benefits of services by the State. Id. However, plaintiff fails to set forth any facts demonstrating that DOCCS denied his requests based on his disability.[12] In fact, plaintiff's claim that, on October 29, 2010, he was denied a transfer to a sensorially-disabled facility is remedied by the fact that he was transferred to a sensorially-disabled facility on January 26, 2011. Compl. ¶ 6(108), 6(110).

It is well-settled that DOCCS does not need to provide an inmate every accommodation he requests or provide the specific accommodation requested. Kearney v. N.Y.S.D.O.C.S., No. 9:11-CV-1281 (GTS/TWD), 2013 WL 5437372, at *8 (N.D.N.Y. Sept. 27, 2013). The record supports that DOCCS provided several accommodations to plaintiff during his incarceration at Clinton. Plaintiff claims that he requested a permit for medical showers from Miller on October 21, 2008, and she granted that request. Compl. ¶¶ 6(25)-(29). On May 21, 2010, plaintiff requested a permit for medical showers again and that request was granted on July 15, 2010. Compl. ¶¶ 6(97), (104). Plaintiff's complaint does not allege any facts to support the claim that DOCCS denied his requests based on his disability, especially given that he was provided with medical passes and other accommodations while he awaited his eventual transfer. See Kearney, 2013 WL 5437372

_____

[12] The Court recommended that plaintiff file an amended complaint alleging ADA claims against DOCCS but plaintiff has failed to do so. Dkt. No. 49 at 38-39.

at *7 (finding no violation of the ADA or RA where prison provided plaintiff with multiple accommodations).

As to plaintiff's transfer to a sensorially-disabled facility, plaintiff requested such transfer on May 21, 2010.  Simpson Aff. Ex. A, at 88.  While that request was pending, plaintiff received permits for showers in his housing block and in-cell food delivery.  Id. at 96.  He also received a magnifying card.  Id. at 101-03.  Plaintiff's complaint does not allege any facts to support the claim that DOCCS denied his requests for a transfer based on his disability.  Accordingly, plaintiff has failed to raise a genuine issue of fact as to DOCCS' alleged violations of the ADA and RA, and it is recommended that defendants' motion on this ground be granted.

### 1.  Eleventh Amendment Sovereign Immunity

As an alternative ground for summary judgment, defendants argue that plaintiff's ADA and RA claims are insufficient to abrogate DOCCS' sovereign immunity under the Eleventh Amendment because he has failed to prove that the violation alleged was motivated by either "discriminatory animus or ill will."  Dkt. No. 93-11 at 23; Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001).  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. AMEND. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134

U.S. 1, 21 (1890)).  Sovereign immunity can be abrogated by an act of Congress and, "[w]ith respect to claims arising under Title II of the ADA, it is clear from the language of the statute that Congress fully intended to abrogate state sovereign immunity. . ." <u>Kearney</u>, 2013 WL 5437372, at *9.  However, "for Title II to abrogate a state's sovereign immunity in a particular claim, authority for said abrogation must exist under the Fourteenth Amendment, which authorizes Congress to 'enforce by appropriate legislation the constitutional guarantee that no State shall deprive any person of life, liberty or property, without due process of law, nor deny any person equal protection of the laws. <u>Id.</u> (citing <u>Garcia</u>, 280 F.3d at 108).  This means that Congress may abrogate a state's sovereign immunity in order to enforce rights guaranteed by the Fourteenth Amendment.  <u>Id.</u>  The Court in <u>Garcia</u> held that the applicable test to determine whether sovereign immunity will be abrogated under the Fourteenth Amendment in a Title II claim is whether "the Title II violation was motivated by either discriminatory animus or ill will due to disability." <u>Garcia</u>, 280 F.3d at 111.   The "discriminatory animus" standard is required in cases where abrogation of the sovereign immunity bestowed by the Eleventh Amendment is grounded in the Equal Protection Clause of the Fourteenth Amendment.  <u>Kearney</u>, 2013 WL 5437372 at *9.

        Plaintiff's claims here are grounded in the Equal Protection Clause of the Fourteenth Amendment, but he has failed to set forth any proof of discriminatory animus or ill will.  His allegations that DOCCS denied his transfer to a sensorially-disabled facility are not only devoid any evidence of discriminatory animus or ill will, but are also factually unsupported, as plaintiff's request was granted and he was sent to a sensorially-disabled facility in January 2011.  Mere delay in granting this request does not amount to a violation.  <u>See</u>

<u>Alster v. Goord</u>, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (dismissing ADA claims on the basis that the plaintiff did not show that delay occurred "because of his disability, rather than as a result of the limitations of the prison medical system.") (internal quotation marks omitted) (citation omitted).  Thus, even if a violation had occurred, sovereign immunity would not be abrogated here.  Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's ADA and RA claims be granted on the alternative ground of sovereign immunity.

### E.  "John Doe" Defendants

Plaintiff names eight "John Doe" defendants in his complaint.  Compl. at 6-7.  He claims that John Does A-F violated his Eighth Amendment rights by using excessive force.  <u>Id.</u> at 11.  He claims further that John Does G and H denied him reasonable accommodations and "disregard[ed] the unsafe and hazardous conditions Clinton prison presented[.]"  <u>Id.</u> at 52.

Plaintiff was permitted time during discovery to both identify and serve the "John Doe" defendants named in the complaint.  Dkt. No. 49 at 40.  He has failed to identify and serve the "John Doe" defendants as recommended despite the fact that this action has been pending for over three and a half years and discovery is now closed.

A plaintiff's <u>pro se</u> status "does not exempt a [plaintiff] from compliance with relevant rules of procedural and substantive law."  <u>Triestman</u>, 470 F.3d at 477 (quoting <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983)).  Under the Federal Rules, if a defendant has not been served within 120 days after the complaint is filed, the Court must dismiss the action without prejudice against the unserved defendants or order that service on those

defendants be made within a specified time. FED. R. CIV. P. 4(m). However, where the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. Id.; N.D.N.Y. L.R. 4.1(b) ("requir[ing]. . .service of process upon all defendants within sixty (60) days of the filing of the complaint.").

When deciding whether to extend a plaintiff's time for serving defendants, "a district court is afforded ample discretion to weight the 'overlapping considerations' involved in determining whether good cause exists, and whether an extension may be granted in its absence." Shepherd v. Fischer, No. 9:10-CV-1524 (TJM/DEP), 2015 WL 1246049, at *21 (N.D.N.Y. Feb. 23, 2015) (citing Zapata v. New York, 502 F.3d 192, 197 (2d Cir. 2007)). Some circuits require district courts to apply a two-step analysis to determine whether good cause exists for an extension to be granted. Zapata, 502 F.3d at 197. However, the Second Circuit has determined that "whether such a bifurcated inquiry would be useful is a question best left to the district court[.]" Id.

Based upon a review of the record, plaintiff has failed to show good cause for his failure to identify and serve the "John Doe" defendants. Plaintiff sought in his discovery demands the names of individuals involved in the alleged assault on plaintiff on December 12, 2008.[13] In August 2013, defendants provided the information requested as part of the Rule 26 Disclosures served on plaintiff. Dkt. No. 68-1 at 1; Dkt. No. 55 (advising the Court that defendants served their initial disclosures on plaintiff). In a letter to plaintiff, dated January 23, 2014, defendants' counsel identifies the page numbers where plaintiff can find the names of the sergeant and officers who escorted him to the Mental Health Observation

---

[13] The John Does involved in this alleged attack are named John Doe A-F in plaintiff's complaint.

Ward on December 12, 2008. Dkt. No. 68-1 at 1. Further, in a letter to the Court, dated March 10, 2014, plaintiff refers to the officers involved in the December 12, 2008 Mental Health Observation Ward incident by name, indicating that he received the names of John Does A-F. Dkt. No. 71 at 6-7. By Order dated April 23, 2014, this Court ordered defendants to provide to plaintiff any classification and movement documents during the period from May 2010 to November 2010. Dkt. No. 77. Such documents were specifically identified by plaintiff as being pertinent to identifying the DOCCS staff responsible for denying his request to be transferred to a sensorially disabled facility.[14] See Dkt. No. 71 at 2. Despite being provided with the information he requested, plaintiff has failed to amend his complaint to identify John Does A-G. Further, the discovery period is now closed and defendants would be prejudiced if plaintiff's claims against the John Doe defendants were not dismissed. Because the John Doe defendants have not been served or otherwise appeared in the action in the appropriate time period, and because there is no good cause to justify plaintiff's failure to identify such defendants, the complaint against John Does A-G should be dismissed without prejudice. Cabassa v. Smith, No. 9:08-CV-480 (LEK/DEP), 2011 U.S. Dist. LEXIS 29720, at *64-65 (N.D.N.Y. Feb. 22, 2011), adopted, No. 9:08-CV-480 (LEK/DEP), 2011 U.S. Dist. LEXIS 29719 (N.D.N.Y. Mar. 22, 2011) (citation omitted) (citing Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)) (dismissing complaint against John Doe defendants without prejudice).

Accordingly, it is recommended that defendants' motion on this ground be granted.

_____

[14] The defendants plaintiff accuses of denying his transfer are identified in the complaint as John Does G and H.

**F. Qualified Immunity**

Defendants contend that they are all entitled to qualified immunity. Dkt. No. 93-11 at 26. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Luna, 356 F.3d at 490 (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "'in light of the legal rules that were clearly established at the time [the official's action] was taken.'" Wilson, 526 U.S. at 614 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal quotation marks omitted); Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." Phillips v. Wright, 553 F. App'x 16, 17 (2d Cir. 2014) (citing Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013)).

Plaintiff has presented a genuine issue of material fact as to his Eighth Amendment claim that Jennette was deliberately indifferent to plaintiff's medical needs where he refused

to honor his feed-in-cell pass.  He has also presented a genuine issue of material fact as to his Eighth Amendment deliberate indifference claim against Patnode where he claims that Patnode (1) interfered with plaintiff's requests for visual accommodations; and (2) did not grant plaintiff's feed-in-cell request or request for medical showers.  Thus, the first prong has been met.  Phillips, 553 F. App'x at 17.  Plaintiff has failed to present a genuine issue of material fact as to defendants Miller, Dr. Maxon, Oshier, Dr. Johnson, Lecuyer, Dr. Lee, LaValley, Artus, and Badger.  Id.

Addressing the second prong of the analysis, inmates possess a clearly-established right to adequate food, clothing, shelter, and medical care while in prison.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Moreover, prison officials must "'take reasonable measures to guarantee the safety of the inmates.'"  Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  Plaintiff's complaint raises material questions of fact demonstrating that defendant Jennette knew that plaintiff possessed a valid pass granting him permission to receive his meals in his cell and deliberately disregarded those passes, depriving plaintiff of receiving food.  Defendants have not offered an explanation as to why Jennette denied plaintiff's pass.  See Williams v. Smith, No. 02 Civ. 4558(DLC), 2009 WL 2431948, at *12 (S.D.N.Y. Aug. 10, 2009) (denying qualified immunity where defendants did not explain the "administrative and safety concerns" that caused them to deny plaintiff's medical passes).  Similarly, defendants have offered no explanation as to Patnode's interference with plaintiff's visual accommodations or his denial of plaintiff's requests for feed-in-cell status and medical showers.  See id.

Thus, given the state of the law as to inmates' rights to adequate food and medical

care and prison officials' obligation to take reasonable measures to guarantee the safety of inmates, it was not objectively reasonable for Jennette to have believed that he could deny plaintiff's use of a validly-issued feed-in-cell pass, and defendants' motion for qualified immunity should be denied as to Jennette. Therefore, defendants have also failed to demonstrate the second and third prongs of the analysis under Phillips as to Jennette. Phillips, 553 F. App'x at 17.

Accordingly, defendants' motion for summary judgment on the ground of qualified immunity should be denied as to Jennette.

The undersigned finds that plaintiff fails to make out a constitutional violation against defendants Miller, Maxon, Oshier, Johnson, Lecuyer, Dr. Lee, LaValley, Artus, and Badger; however, even if plaintiff had sufficiently alleged such violations, these defendants would still be entitled to qualified immunity. The second prong of the qualified immunity analysis requires that the constitutional right be clearly established. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . ." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985)). The unlawfulness of defendants' act or acts must be apparent "in the light of pre-existing law[.]" Id.

Plaintiff has set forth numerous constitutional claims against defendants Miller, Dr. Maxon, Oshier, Dr. Johnson, Lecuyer, Dr. Lee, LaValley, Artus, and Badger alleging claims of (1) Eighth Amendment medical deliberate indifference; (2) First Amendment retaliation; and (3) First Amendment denial of access to courts. All alleged violations are based on clearly-established constitutional rights. See Taylor v. Goord, No. 9:09-CV-1036

(FJS/DEP), 2010 WL 3825661, at *11 (N.D.N.Y. Sept. 2, 2010) (holding that the law regarding medical deliberate indifference "was mature and well-developed by 2000."); Genas v. N.Y. Dep't of Corr. Servs., 75 F.3d 825, 833 (2d Cir. 1996) (holding that "plaintiff had a clearly established right to be free of retaliatory action taken because he exercised his constitutionally protected right to petition for redress."); Collins v. Goord, 581 F. Supp. 2d 563, 580 (S.D.N.Y. 2008) (holding that a prisoner's right of access to the courts is clearly established).

However, for the reasons established in the sections above, it was objectively reasonable for the defendants to act as they did in providing medical care to plaintiff. See supra section III.B. Plaintiff's Eighth Amendment claims are based on alleged deliberate medical indifference and his First Amendment claims are based on the same set of facts alleged for his medical indifference claim—that the alleged failure to provide plaintiff with appropriate vision aides impeded his access to the courts and that vision aides and other medically-necessary care were withheld from plaintiff in retaliation for his filing grievances. Compl. at 52-53. For the reasons stated in the previous sections, defendants Miller, Dr. Maxon, Oshier, Dr. Johnson, Lecuyer, Dr. Lee, LaValley, Artus, and Badger are entitled to qualified immunity because they have shown that it was objectively reasonable to believe that they did not violate plaintiff's rights. See Hathaway, 37 F.3d 63 at 69.

Accordingly, defendants Miller, Dr. Maxon, Oshier, Dr. Johnson, Lecuyer, Dr. Lee, LaValley, Artus, and Badger are entitled to qualified immunity, and it is recommended that defendants' motion on this ground be granted in the alternative.

## IV. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 93) be:

1. **GRANTED** as to the (1) Eighth Amendment medical deliberate indifference claims against defendants Oshier, Blaise, Miller, Dr. Maxon, Lecuyer, Badger, Dr. Lee, Ezero, LaValley, Artus, and Dr. Johnson; (2) First Amendment denial of access to the courts claims against Oshier, Miller, Dr. Maxon, Lecuyer, and Dr. Johnson; (3) First Amendment retaliation claims against defendants Oshier, Miller, Dr. Maxon, Dr. Johnson, Lecuyer, Ezero, Jennette, and LaValley; (4) ADA and RA claims against defendant DOCCS; (5) all claims against the John Doe defendants; (6) Eighth Amendment claims against defendants LaValley and Artus regarding plaintiff's admission to the mental health observation unit; (7) First Amendment claims against defendants LaValley and Artus regarding plaintiff's admission to the mental health observation unit; and (8) qualified immunity as to defendants Oshier, Blaise, Miller, Dr. Maxon, Lecuyer, Badger, Dr. Lee, and Dr. Johnson.

2. **DENIED** as to the (1) Eighth Amendment medical indifference claims against defendants Jennette and Patnode; (2) First Amendment claims against defendant Patnode; and (3) qualified immunity as to defendants Jennette and Patnode; and it is further

**RECOMMENDED** that defendants Oshier, Blaise, Miller, Dr. Maxon, Lecuyer, Badger, Dr. Lee, Ezero, LaValley, Artus, and Dr. Johnson be dismissed from this action; and it is

**ORDERED** that the Clerk's Office make necessary changes to the Docket to reflect the actual name of defendant Kilburn; and it is

**ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

DATED:    July 13, 2015
            Albany, New York

Christian F. Hummel
U.S. Magistrate Judge